# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MODERN, INC., and
FIRST OMNI SERVICE CORP.,

                 **Plaintiffs,**

-vs-                                      **Case No.  6:03-cv-718-Orl-31KRS**

STATE OF FLORIDA, DEPARTMENT OF
TRANSPORTATION, ST. JOHNS RIVER
WATER MANAGEMENT DISTRICT, and
UNITED STATES FISH & WILDLIFE
SERVICE,

                  **Defendants.**

_____

ST. JOHNS RIVER WATER
MANAGEMENT DISTRICT,

           **Third Party Plaintiff,**
vs.

THE GREAT OUTDOORS PREMIER
R.V./GOLF RESORT, INC.,

           **Third Party Defendant.**

_____

## ORDER

      This matter comes before the Court after a hearing on the Motion for Summary Judgment

(Doc. 289) filed by the Plaintiffs, Modern, Inc. and First Omni Service Corp., and the responses to

that motion filed by Defendants State of Florida Department of Transportation ("FDOT") (Doc.

242), St. Johns River Water Management District ("St. Johns") (Doc. 297), and the United States Fish & Wildlife Service ("Fish & Wildlife") (Doc. 298).[1]

## I.      Background

The Plaintiffs – henceforth referred to as "Modern" for ease of reference – and Defendants St. Johns and Fish & Wildlife own or manage real estate in the area of the intersection of Interstate 95 ("I-95) and State Road 50 ("S.R. 50") near Titusville.  Modern owns several parcels (collectively, the "Property") that are located, in general terms, adjacent to I-95 north of the intersection.  (Doc. 292).  According to Modern, the three tracts it owns total approximately 142.5 acres of land.  (Doc. 71 at 3).  The approximately 6,200-acre St. Johns National Wildlife Refuge (the "Refuge") is located to the west and north of the Property[2]. (Doc. 251 at 4).  The federally owned Refuge is managed by Fish & Wildlife.  (Doc. 298 at 2).  St. Johns owns and manages two parcels of conservation land – the Seminole Ranch and the Canaveral Marsh – which abut the Refuge on portions of its western and southern boundaries, respectively. (Doc. 298 at 2-3).  The Seminole Ranch and Canaveral Marsh are owned and managed by St. Johns.  (Doc. 289 at 2-3).

---

[1]Modern initially filed its motion for summary judgment at Docket entry 206.  St. Johns initially filed its response at Docket entry 240, FDOT filed its response at Docket entry 242, and Fish & Wildlife filed at Docket entry 251.  By Order April 7, 2006 (Doc. 288), the Court required Modern, St. Johns and Fish & Wildlife (but not FDOT) to refile their respective papers, leading to FDOT's response (Doc. 242) having a lower docket number than Modern's motion (Doc. 289), to which it responds.

[2]The Refuge actually consists of two non-adjacent parcels – the Highway 50 Unit, which lies to the west and north of the Property, and the Beeline Unit, which is located far to the south of the Property. (Doc. 251 at 4-5).  The Beeline Unit is not relevant to this dispute, and therefore the term "Refuge" in this opinion will refer only to the Highway 50 Unit.

The Property and the Refuge were, at one time, part of the Titusville Fruit and Farm Lands Subdivision ("Titusville Farms"), which was platted in the early 1900s.[3]  (Doc. 289 at 3).  The natural sheet flow of water on the Titusville Farms was generally from the northeast to the southwest, toward the St. Johns River, which passes near the southwest corner of the Refuge. (Doc. 289-4 at 2)  Over the years various canals were excavated on the Titusville Farms land to redirect the natural flow of surface water and drain it more efficiently.  Modern refers to these canals as the "Drainage System."[4]  (Doc. 289 at 4).

In the 1970s, Fish & Wildlife began acquiring portions of Titusville Farms, creating the Refuge in an (ultimately unsuccessful) effort to save the endangered Dusky Seaside Sparrow. (Doc. 289 at 7).  Around the same time, St. Johns began acquiring property in and around Titusville Farms to protect the St. Johns River.  (Doc. 289 at 8).  Over time, both Fish & Wildlife and St. Johns have taken steps such as filling in canals – or allowing others to fill them in – that have reduced the efficiency of the drainage on the land they manage and own, respectively.  (Doc. 289 at 10-12).

The record is not entirely clear, but it appears that Modern acquired the Property via a series of transactions in the 1990s. (Doc. 71 at 19-82).  In 1996, Modern began complaining to St.

_____

[3]The date of the platting is in dispute.  Modern contends it occurred in 1911.  (Doc. 289 at 3). Fish & Wildlife contends that the plat shows on its face that it was recorded in 1914.  (Doc. 251 at 2).

[4]Modern does not specify the locations or completion dates of the canals that it believes are or were part of the Drainage System.  While reserving judgment as to whether a "Drainage System" ever existed, the remainder of this opinion will utilize that term to refer to the drainage canals that now exist or existed at some time after 1911 on the land constituting Titusville Farms.

Johns of flooding, allegedly caused by restriction and plugging of canals in and around the Refuge.  (Doc. 292).  After a series of meetings between Modern and Brevard County, FDOT and Fish & Wildlife, a deal was worked out to have some canals that bordered the Refuge altered in an effort to eliminate the flooding of the Property.  (Doc. 292-4 at 2).

In February 1997, Modern performed what it described as maintenance of some ditches on and near the Property in an attempt to alleviate the flooding.  (Doc. 289 at 14).  Shortly thereafter, Fish & Wildlife discovered that hundreds of acres of Refuge wetlands north of the intersection of S.R. 50 and I-95 had begun drying up.  (Doc. 292-5 at 2).  St. Johns concluded that Modern's ditch work went far beyond mere "maintenance" and had resulted in the draining.  (Doc. 292-6 at 2-3).  St. John's authorized Fish & Wildlife to construct two weirs to stop the draining and filed an administrative complaint seeking to have Modern undo the ditch work and restore the Refuge wetlands.  (Doc. 292-6 at 3).  Modern fought these measures, but in 2001 the First District Court of Appeal sided with St. Johns, upholding its determinations.[5]  (Doc. 292-6 at 3).

Modern had filed suit in state court in 1997, seeking damages for the flooding under a number of theories.  (Doc. 71 at 8).  The state court dismissed the complaint and held the suit in abeyance until Modern exhausted its administrative remedies.  (Doc. 71 at 8).  After the decision of the First District Court of Appeals, Modern reinstituted its damages suit, which was subsequently removed to this Court.  (Doc. 1).  Modern, now proceeding under its Fourth Amended Complaint, makes inverse condemnation claims against St. Johns (Count I) and FDOT (Count II), requests a declaratory judgment as to its drainage easement rights in the land controlled

---

[5]Modern contends it had "substantially completed" the restoration by July 2003.  (Doc. 289 at 15).

by those defendants (Count III), seeks to quiet title under federal law (28 U.S.C. § 2409a) against

Fish & Wildlife (Count IV), and finally, in the alternative, demands permanent injunctive relief to

prevent St. Johns and FDOT from interfering with the operation of the drainage ditches and

requiring them to abate the flooding of the Property (Count V).  (Doc. 71).

Modern now moves for summary judgment on Counts III and IV (Doc. 289 at 16-22),

partial summary judgment as to its inverse condemnation claims (Counts I and II) (Doc. 289 at 23-

24), and summary judgment as to certain defenses and affirmative defenses raised by St. Johns and

Fish & Wildlife. (Doc. 289 at 26-30).

## II.    Standards

A party is entitled to summary judgment when the party can show that there is no genuine

issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the

substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark

v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a

dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving

party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who

fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25.

The party opposing a motion for summary judgment must rely on more than conclusory statements

or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

III.    **Analysis**

A.    **Easements**

Generally speaking, an easement is the right in the owner of one parcel of land (known as the "dominant estate"), by reason of such ownership, to the unfettered use of the property of another (known as the "servient estate") for a special purpose not inconsistent with the general property rights of the owner. *See*, *e.g.*, *Easton v. Appler*, 548 So. 2d 691, 694 (Fla. 3d DCA 1989). Easements may be created by express grant, by implication, or by prescription. *American Quick Sign, Inc. v. Reinhardt*, 899 So. 2d 461, 465 (Fla. 5th DCA 2005). An express easement may be created by way of a grant contained in a deed or other written document. *Id.* at 464-65. An implied easement may arise from an implied reservation in a deed, from a conveyance with reference to a plat or map showing streets or ways, or as a way of necessity. 20 Fla. Jur. 2d Easements § 25. Once created, an easement is transferred with the dominant estate even if not mentioned in the instrument of transfer. *Behm v. Saeli*, 560 So. 2d 431, 432 (Fla. 5th DCA 1990).

Modern offers six different arguments as to why it has easement rights in the Drainage System. Each is addressed below.

### 1.    Common Law Dedication

Modern contends that it has easement rights in the Drainage System because the canals

making it up were dedicated by common law to the public.  (Doc. 289 at 16).  Common law

dedication is the setting apart of land for public use.  *Brevard County v. Blasky*, 875 So. 2d 6, 10

(Fla. 5th DCA 2004).  "To constitute a dedication, whether an express dedication or an implied

dedication, there must first be shown a clear intention by the owner, as indicated by his or her

words or acts, to offer the land for public use. Thereafter, there must be an acceptance of the

dedication by the public." *Id.*  The party asserting the existence of the dedication bears the burden

of proof and must present "clear and unequivocal" evidence of an intention to dedicate.  *Id.*

> The means generally exercised to express one's purpose or intention to dedicate his
> lands to the public use are by a (1) written instrument executed for that purpose; (2)
> filing a plat or map of one's property designating thereon streets, alleys, parks, etc.;
> (3) platting one's lands and selling lots and blocks pursuant to said plat indicating
> thereon places for parks, streets, public grounds, etc.; (4) recitals in a deed by which
> the rights of the public are recognized; (5) oral declarations followed by acts
> consistent therewith; (6) affirmative acts of the owner with reference to his property,
> such as throwing it open in a town, fencing and designating streets thereon; (7)
> acquiescence of the owner in the use of his property by the public for public
> purposes.

*City of Palmetto v. Katsch*, 98 So. 352, 353 (Fla. 1923).

Dedication by a developer is, in essence, only an offer to dedicate and requires an

acceptance by the public before it becomes effective.  *Smith v. City of Melbourne*, 211 So. 2d 66,

68 (Fla. 4th DCA 1968).  The acceptance need not be formal, but may be implied from the

public's improving or repairing the offered area, "or from any other act with respect to the subject

matter that clearly indicates an acceptance." *Id.*

According to Modern, the original developer recorded the Titusville Farms plat (henceforth, "the Plat") in 1911, advertised lots in the Plat with reference to the Drainage System, sold individual lots referenced on the Plat to individual purchasers, and referenced the Plat in deeds to subsequent purchasers, all around the time of the recording of the Plat. (Doc. 289 at 17).

At least some of the types of evidence that Modern relies on here could support a conclusion that the developer intended to dedicate drainage facilities to public use. However, the particular evidence cited by Modern is not strong enough to compel such a conclusion, at least not at the summary judgment stage. The Plat that Modern relies upon does not refer to a Drainage System, or even to "canals" or "ditches". Instead, the Legend of the Plat contains the word "road." (Doc. 70 at 25). In effect, Modern contends that the word "road" in the Plat should be treated as if it included the word "canal" or something similar. (Doc. 289 at 19). The Court has already held that the Plat is ambiguous as to whether its references to a "road" were also intended encompass drainage facilities. (Doc. 70 at 25-27). Because of this ambiguity – discussed in greater detail below – recording of the Plat and selling lots with reference to it does not constitute "clear and unequivocal" evidence that the developer intended to dedicate the Drainage System to the public.

Modern's evidence that the developer advertised with reference to the Drainage System consists of dozens of pages of what appear to be old newspaper articles and advertisements, which simply indicate that, at some point, drainage ditches were dug somewhere on Titusville Farms.[6] (Doc. 289-17). Even assuming that these old newspaper excerpts would be admissible evidence,

---

[6]As an example, Modern's first two newspaper articles describe a new and improved ditch digging machine that will be used on Titusville Farms. (Doc. 289-12 at 2-3). The first advertisement informs the reader that "Titusville Fruit and Farm Lands Are Selling Fast" and that "Our Big Ditching Machine is on the way and will be operative in a short time." (Doc. 289-12 at 4).

and further that they might constitute oral declarations (or acts consistent therewith) or one of the other categories of evidence referenced in *Katsch*, Modern does not point to a single article or advertisement unambiguously demonstrating that the developers intended to dedicate the Drainage System to the public.

Modern's evidence of public acceptance of the alleged dedication is equally tenuous.  It consists of the following contentions: that in 1967, Brevard County vacated and abandoned certain portions of the rights-of-way referenced on the Plat (Doc. 292-9); that in 1974, Brevard County's Public Works Division informed Fish & Wildlife that the division would recommend refusal by the Board of County Commissioners of any request that the County vacate (unspecified) rights-of-way in the Refuge[7] (Doc. 291-2 at 2); that in 1978 Brevard County allegedly refused to vacate some rights-of-way because they were dedicated to facilitate drainage in the area[8]; that in 1987, the city of Titusville formally vacated a portion of the rights-of-way and transferred title to FDOT for improvements to S.R. 50 (Doc. 292-10);[9] and that in 2001, Brevard County opined regarding the rights-of-way that "public drainage is routed through and is dependent on existing conveyances in

---

[7]There is no suggestion that Fish & Wildlife ever presented this request to the Board itself or that the Board ever considered whether the County ought to vacate any rights-fo-way in the Refuge.

[8]Modern does not provide a record citation to support this contention.  (Doc. 289 at 17).

[9]It is not clear what property rights the transaction involved.  The resolution accomplishing the transaction (Doc. 292-10 at 2) does not describe the property in detail, and key portions of the accompanying deed (Doc. 292-10 at 3-4) are illegible.  As such, the Court cannot discern how this transaction might support Modern's argument that an acceptance of the Drainage System occurred.

the Refuge."[10]  (Doc. 289 at 17-18).  Finally, Modern argues that Brevard County's refusal to

vacate the Plat implies that Brevard claims an interest in it.  (Doc. 289 at 18).

Modern does not provide any evidence of any member of the public informally accepting

the alleged dedication by, for example, improving the "road".  Modern does not offer any evidence

of either of the relevant governmental entities – Brevard County or Titusville – formally accepting

the dedication.  What little evidence Modern offers is, at best, ambiguous – i.e., conduct such as

vacating rights of way that is consistent with having previously accepted the dedication.

However, this conduct is equally consistent with a willingness by the governmental entities to

"sign away," for purposes of clearing title, property rights that neither actually possessed due to a

lack of dedication or acceptance.  In short, Modern has failed to show that it is entitled to summary

judgment on its claim to easement rights via public dedication.

2.    Easement implied by plat

Where a conveyance is made with reference to a plat or map, distinct and independent

private rights in other lands of the grantor than those granted may be acquired, by implied

covenant, as appurtenant to the premises granted, although they are not of such a nature as to give

rise to public rights by dedication." 20 Fla. Jur 2d Easements § 29.  For example, when property

is conveyed by means of a deed that refers to a plat on which streets, parks, or other open areas are

shown, the buyers acquire an implied private easement with respect to the areas dedicated on the

plat.  *Easton*, 548 So. 2d at 694 (citing cases).  This rule may apply to man-made bodies of water

as well as land.  *Reiger v. Anchor Post Products, Inc.*, 210 So. 2d 283 (Fla. 3d DCA 1968) (where

---

[10]Modern does not provide a record citation to support this contention.  (Doc. 289 at 18).

plat recited that man-made lake had been dedicated "to the joint and several use of the lot owners of lots fronting on said lake," those owners had exclusive implied private easement and could deny public access to lake).  The principle of the implied private easement is based on estoppel; prospective purchasers induced to purchase lots in reliance on the grantor's representations regarding open areas referenced to in the plat may bind the grantor to his representations.  *Easton* at 694.  The extent of an easement implied by a plat depends on the intent of the parties.  *Id.*  The easement acquired by a conveyance with reference to a plat may be lost by adverse possession.  20 Fla. Jur 2d Easements § 66.

Modern's evidence with regard to the intent of the Titusville Farms developer on this point consists of the same old newspaper articles and advertisements cited in support of the common law dedication argument.  (Doc. 289-12).  Modern does not attempt to identify the relevant portions of these documents, many of which do not even appear to be relevant to the issue of the developer's intent with regard to the Plat.[11]  Modern also points to "various deeds" that included the following language: "Subject to rights-of-way, as shown by said plat for public roads, and *excepting rights-of-way for necessary ditches*."  (Doc. 289 at 18-19) (emphasis added by Modern). But the italicized language does not in any way suggest that the developer provided drainage easements via the Plat.  If anything, it suggests the opposite – that the developer thought that easements for necessary drainage ditches had *not* been provided in the Plat, hence the need to

---

[11]A typical article, apparently taken from the July 7, 1911 edition of the *East Coast Advocate*, begins as follows: "C.J. West & Co., of Titusville, is one of our new land companies, and ... [the firm is] selling the Titusville Fruit and Farm ... of about 30,000 acres of land a few miles southwest of Titusville.  On Sunday ... the *Advocate* editor and wife had the pleasure of inspecting this fine body of land, with which they were much pleased."  (Doc. 289-12).

provide for them in the deeds.  It might be that the developer was being over-cautious, and was simply reiterating a right that it had intended to grant via the Plat; but even if this were the case, the deed language is not, itself, evidence of that intent.  Modern has not shown that it is entitled to summary judgment on this point.

3.      Private express easement by plat

As the Court previously observed (Doc. 70 at 25), the legend of the Plat contains several references to "road," without precisely defining what the word is intended to encompass.  Without reiterating that entire discussion here, the Court found the word "road" was ambiguous as used in the Plat.  (Doc. 70 at 26).  Therefore, the possibility that the Plat's "road" easements were also intended to encompass drainage easements could not be ruled out, and the Defendants were not entitled to summary judgment.  (Doc. 70 at 26-27).  Modern now moves for summary judgment that the use of the word "road" in the Plat definitely *did* include the right to drain waters, and that it therefore has a private, express easement right in the  Drainage System described in the Plat. (Doc. 289 at 18).

Modern first contends that the term "road right of way" necessarily includes the right to maintain drainage facilities such as ditches, canals and levies.  (Doc. 289 at 19).  But the Plat does not contain the term "road right of way," it merely contains the term "road".  In addition, the case Modern cites in support of this expansive definition of "road right of way" is construing that term within a particular statute – Fla. Stat. § 73.071 – that is not applicable in this case.  *See Joynt v. Orange County*, 701 So. 2d 1249, 1250 (Fla. 5th DCA 1997).  Modern does not cite any cases construing the term in circumstances similar to those of the instant case.

Modern raises several other supporting arguments: that the Court must construe the Plat

broadly, that Titusville Farms could not have been used for a beneficial purpose without a

drainage system, and that because the developer constructed the Drainage System for agricultural

purposes, the word "road" on the Plat must have included the right to drain waters.  (Doc. 289 at

19).  But Modern does not cite a single item of factual or precedential support for these arguments.

Modern has not demonstrated an entitlement to summary judgment as to the interpretation of the

word "road" or the existence of a private express easement arising from the Plat.

> 4.       Private express easement by deed

"There are no magical words that one must divine in order to create an express easement.

All that is necessary are words showing the intention of the parties to create an easement on a

sufficiently identifiable estate." *American Quick Sign*, 899 So. 2d at 465.  An easement

appurtenant is one that benefits the dominant estate and helps the landowner in his physical use of

the land benefitted.  *Behm* at 432.

Modern contends that it has an easement appurtenant in the Drainage System pursuant to

deeds from its predecessors in interest in the Property.  (Doc. 289 at 19).  In support, Modern

makes several factual claims – that the "Drainage System" was designed to benefit the Property,

that it did in fact benefit the Property as shown by the existence of a citrus grove and historical

publications – without citing to any record evidence to support them.  Modern also cites to four

deeds (Doc. 289-27, 290-1, 290-4, and 290-5), but does not explain their import or even their

location within Titusville Farms.  So far as the Court is able to tell, none of the cited information

contains "words showing the intention of the parties to create an easement on a sufficiently

identifiable estate," as required by the case law.  Modern is not entitled to summary judgment on this point.

5.     Private implied easement from 1957 Sun Charm transaction

An easement by implication requires, *inter alia*, unity of title between the dominant and servient estate, followed by a severance.  *Kirma v. Norton*, 102 So. 2d 653, 656 (Fla. 2d DCA 1958).  The implied easement is held to be necessary to the complete enjoyment of the one estate because of circumstances existing at the time of the severance.  *Id.*  "Frequently, it is held that a use, to be an implied easement, must have been continuous, apparent, permanent and necessary when the unified title was severed."  *Id.*  In this context, "apparent" does not necessarily mean "visible," but the use must be something that might be discovered by reasonable inspection.  *Id.*

Modern argues, and the Defendants do not dispute, that at least one of its predecessors acquired its interest in what would become the Property pursuant to a warranty deed that contained the following language: "The parties have the right to enter on any part of the adjoining lands from time to time for the purposes of keeping the drainage ditches open and to work the roads."  (Doc. 289 at 20-21).  Modern attaches aerial photographs (Doc. 290-6) that purportedly demonstrate the existence and use of the Drainage System at the time of the transaction.  However, the photographs' captions indicate they were taken over the course of several decades and, more importantly, their poor reproduction and absence of description or explanation renders them useless for the purpose of establishing the existence of any sort of drainage system at any point in time.  Moreover, contrary to Modern's argument, it is not clear that the Drainage System was apparent because people could (allegedly) see it.  Someone viewing a drainage ditch on one portion of the Titusville Farms would not necessarily know that it was being used to drain a far

distant portion of that same property, or that the purchaser of the distant portion would therefore have a right to continue that use.  In addition, Modern's unsupported assertions fall far short of demonstrating that the Drainage System, if it existed, was "necessary" to the enjoyment of the Property.  Modern is not entitled to summary judgment on this point.

6.      Private common law flowage easement

Florida follows what is known as the "reasonable use" rule with regard to surface waters. *Westland Skating Center, Inc. v. Gus Machado Buick, Inc.*, 542 So. 2d 959, 962 (Fla. 1989). "Under this rule, a possessor of land is not unqualifiedly entitled to deal with surface waters as he pleases nor is he absolutely prohibited from increasing or interfering with the natural flow of surface waters to the detriment of others." *Id.* at 961.  "Each possessor is legally privileged to make reasonable use of his land even though the flow of surface waters is altered thereby and causes some harm to others.  He incurs liability only when his harmful interference with the flow of surface waters is unreasonable." *Id.*

Despite adoption of the reasonable use rule, an upper landowner continues to enjoy an easement across the lower tract for all naturally occurring surface water so long as the land remains in its natural state. *Id.* at 963.  However, when any party improves his land, thereby causing surface waters to damage his neighbor's property, the reasonable use rule applies. *Id.*

Modern argues that it has the right to "improve the natural flow of surface water to make a more beneficial use of his or her land," *Seminole County v. Mertz*, 415 So. 2d 1286, 1289 (Fla. 5th DCA 1982), including the right to create canals and use other methods to channel the natural flow of surface water into a more efficient drainage system, *Callan v. G.M. Cypher Co.*, 70 So. 841, 844-45 (Fla. 1916).  Modern then argues that, because the historical flow of surface water

-15-

was generally westward through what is now the Refuge toward the St. Johns River, it is therefore entitled to summary judgment as to Counts III (declaratory judgment) and IV (federal quiet title act). (Doc. 289 at 22). Beyond the foregoing, Modern does not specify the basis for this entitlement – such as, for example, by identifying the particular activity that has violated its alleged common law flowage easement.

In their memoranda, St. Johns and Fish & Wildlife do not dispute Modern's assertion that the natural surface water flow in this area is from the Property generally westward through the Refuge. It would therefore follow that Modern has a common law easement along that path for its surface waters. But it does not necessarily follow that Modern is entitled to judgment on Counts III and IV. Modern has made no showing that the Defendants have interfered with the natural flow of waters from the Property. Rather, the activities of which Modern complains – principally the filling-in of drainage ditches – would restore the natural flow of surface water, not impede it.[12] In addition, to the extent that the Defendants' property might be considered to have been improved – and therefore subject to the reasonable use rule – Modern has made no showing that the filling of ditches or other activities that have allegedly led to flooding of Modern's land was an unreasonable use. Modern is not entitled to summary judgment on this point.

## B.      Inverse Condemnation

The Florida Constitution provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the

---

[12]The Court notes that much of Modern's case is based on an argument that surface waters do *not* naturally flow off its land – hence the need for the Drainage System to make the Property economically viable.

registry of the court and available to the owner."  Fla. Const. Art. 10 Sect. 6(a).  Modern interprets

this to mean that, under Florida law, a party is entitled to recover on an inverse condemnation

claim when he or she proves that 1.) property 2.) has been taken 3.) for a public purpose 4.)

without full compensation.[13]  (Doc. 289 at 23).  Modern therefore seeks partial summary judgment

as to elements 1, 3, and 4 in regard to its inverse condemnation claims against St. Johns (Count I)

and FDOT (Count II).  Specifically, Modern contends it is entitled to a summary judgment that it

has a compensable interest in the Property, that the actions of St. Johns and FDOT were for a

public purpose, and that neither of these Defendants have compensated Modern for the taking of

the Property.

　　　Modern cites no case law in support of its contention that it is entitled to such a piecemeal

summary judgment.  Rule 56(c) requires the entry of summary judgment if the pleadings and other

materials "show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  All Modern has shown here is particular material facts as

to which there is (allegedly) no genuine issue.  Even if Modern is correct as to the facts underlying

the three elements it cites, it has not shown entitlement to any judgment.  Moreover, Modern's

memorandum lacks sufficient evidence and specificity to enable the Court to enter judgment on its

behalf.  To establish its compensable interest in the Property, Modern must present evidence of its

ownership, not merely point to a lack of objections from the Defendants.  To establish that actions

were taken for a public purpose, Modern must at least identify the particular actions at issue rather

---

[13]The only case law Modern cites in support of this interpretation – *Loretto v. Teleprompter Manhattan CATV Corporation*, 458 U.S. 419 (1982) – construes the takings clause of the Fifth Amendment of the United States Constitution, not Article X of the Florida Constitution.

than broadly referring in its memorandum to "St. Johns and FDOT's actions described herein".

(Doc. 289 at 23).  Insofar as St. Johns and/or FDOT agree with the issues raised by Modern here,

the proper procedure would be to include them in the statement of undisputed facts rather than

relying on Rule 56.

## V.       Defenses

Modern attacks a number of the affirmative defenses raised by various Defendants, as

discussed below.

### 1.       Exhaustion of administrative remedies

In its answer, St. Johns asserts that Modern has failed to exhaust the administrative

remedies provided by Chapter 120, Florida Statutes.  (Doc. 74 at 9).  Modern argues that no

administrative process is required for a takings claim once a physical invasion has occurred; that

an administrative court has no power to issue the injunctive relief it seeks; and that an

administrative judge lacks the jurisdiction to determine the existence of easement rights.  (Doc.

289 at 24).  St. Johns does not contest these arguments directly.[14]  Instead, it responds that, while it

does not believe it can be held responsible under takings law for issuing permits that ultimately

resulted in flood damages to the Property,[15] to the extent it could be held so liable, Modern must

challenge the issuance of the permits under Chapter 120 to afford St. Johns "the opportunity to

---

[14]St. Johns concedes that its failure-to-exhaust defense targets only the inverse condemnation claim, not Modern's declaratory judgment claim.  (Doc. 297 at 17).

[15]St. Johns is not alleged to have performed any of the construction or ditch-filling that resulted in flooding of the Property.

correct its permitting decision before being exposed to potential inverse condemnation liability."

(Doc. 297 at 16).

St. Johns does not cite any cases that directly support the proposition that it must be given a chance to rescind the permits before being held liable for an inverse condemnation claim based on their issuance.  Instead it relies on a line of cases involving government regulations that deprive owners of substantially all use of their property without just compensation.  (Doc. 297 at 16 n.16).  In such cases, rather than having the regulation struck down as unconstitutional, the government "is forced to choose between paying just compensation to keep the regulation in effect or removing the regulation."  *Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corp.*, 640 So. 2d 54, 57 (Fla. 1994).  But the issue here is whether a taking has occurred, not whether St. Johns acted properly in issuing the permits. "It is a settled proposition that a regulation or statute may meet the standards necessary for exercise of the police power but still result in a taking." *Department of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc.*, 521 So. 2d 101, 103 (Fla. 1988).  Moreover, a temporary deprivation of substantially all economically beneficial or productive use of land may constitute a taking.  *A.G.W.S. Corp* at 58.  Therefore, rescission of the permits will not allow St. Johns to entirely avoid any inverse condemnation liability it now faces.

2.      Sovereign immunity

Modern argues that the Defendants cannot raise an sovereign immunity defense to an inverse condemnation claim, a request for an injunction for trespass based on flooding, a request for a declaratory judgment as to easement rights, or a quiet title claim under 28 U.S.C. § 2409a. (Doc. 289 at 26).   St. Johns concedes or fails to respond to these points, but argues that insofar as Modern's claims might be construed as "tort claims related to the negligent issuance of permits,"

sovereign immunity would be applicable. (Doc. 297 at 17). As Modern has not raised a

negligence claim, sovereign immunity is not applicable, and Modern is entitled to summary

judgment on this defense.

        3.    Issuance of Permit

St. Johns asserts, in its answer, that no cause of action exists "against a regulatory body for

a physical interference with property rights that results from the issuance of a regulatory approval

that is subject to obtaining all necessary property rights to implement the regulated activity."

(Doc. 74 at 9). Modern responds that a government entity "can always be held liable for the

appropriation of property through the issuance and approval of discretionary permits." (Doc. 289

at 25). In support of this proposition, Modern cites to the case of *Hillsborough County v.*

*Gutierrez*, 433 So. 2d 1337, 1338 (Fla. 2d DCA 1983), *abrogated on other grounds*, *First English*

*Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304 (1987).[16] In

*Gutierrez*, the plaintiffs lived on a piece of property that was bordered by a subdivision under

construction. *Id.* at 1338. During the construction, Hillsborough County "had the responsibility to

the general public to assure that the developer's drainage plan would work effectively for the

disposal of all surface drainage water." *Id.* The drainage system was not built according to the

plan, and fill material was improperly added to a portion of the subdivision abutting the plaintiffs'

property, and flooding resulted. *Id.* The trial court found that the County was responsible for

enforcing construction in accordance with the plan and that its review procedures should have

---

[16]The *Gutierrez* court held that the plaintiffs' private property had not been taken because the flooding had been remedied and Florida did not recognize a "temporary" taking. *Gutierrez* at 1338. In *First English*, decided four years later, the Supreme Court recognized a cause of action for temporary taking.

determined that the fill material would block the natural flow of surface drainage water and cause

flooding of some of the plaintiffs' property.  *Id.*  On appeal, the court upheld the judgment against

the County that the plaintiffs' land had been taken.  *Id.*

The *Gutierrez* opinion does not explain the basis upon which the County was held

responsible for the developer's drainage system or for the failure of its review process to catch the

fill material issue.  Contrary to Modern's argument, the opinion does not even imply that this

responsibility was based upon "the issuance and approval of discretionary permits."  As such, the

*Gutierrez* case does not support Modern's position.[17]  Modern has failed to demonstrate an

entitlement to summary judgment on this point.

        4.      Reasonable use

In its answer, St. Johns offers as its third defense its contention that, "[i]n the absence of an

express easement for the benefit of [Modern's] lands, the filling of the ditches west of Hacienda

Road by [Fish & Wildlife] was a reasonable use of the land of [Fish & Wildlife] pursuant to the

common law of Florida.  A lower-lying landowner is not required under the common law to

permit an upper owner to construct artificial drainage works through the lower-lying landowners'

property."  (Doc. 74 at 10).  Modern complains that St. Johns, citing the reasonable use rule,

"erroneously claims that Plaintiffs cannot divert surface waters to a downstream landowner

through artificial drainage structures."  (Doc. 289 at 26).  But, as the above-quoted text shows, St.

Johns' answer makes no such claim.  Modern is not entitled to summary judgment on this point.

---

[17]Modern also cites, without elaboration, to *Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419, 426 (1982) for this proposition, but that case involved a challenge to a state law, not
a permit, and therefore it also does not stand for the stated proposition.

5.    Statutory immunity

_____In addition to sovereign immunity, St. Johns asserts in its answer that it is entitled to

statutory immunity pursuant to Section 373.443, Florida Statutes, which provides in relevant part

that no action may be brought against the state or a district for the recovery of damages caused by

the failure of stormwater management systems, dams and similar facilities based upon, *inter alia*,

approval of construction permits or issuance of any order relative to maintenance or operation.

(Doc. 74 at 10-11).  As with its sovereign immunity defense, St. Johns concedes that this statutory

immunity is not a defense to a taking claim, but it raises it in the event the Court determines that

Modern's claim "involves, at most, negligence in permitting."  (Doc. 297 at 18).  Again, as

Modern has not raised a negligence claim, St. Johns cannot raise this defense.

6.    Failure to Avoid or Mitigate Damages

_____St. Johns contends that Modern has failed to mitigate damages because it has not applied

for permits to excavate drainage ditches and because it has not exhausted its administrative

remedies.  (Doc. 74 at 11).  In its memorandum, St. Johns offers no explanation as to how a failure

to apply for permits to dig ditches might constitute a failure to mitigate damages in a takings case.

Instead, St. Johns explains that this defense is based upon the same principle as its argument that

Modern has failed to exhaust its administrative remedies.  The failure to mitigate defense therefore

fails for the same reasons as the failure-to-exhaust defense.

7.    Abandonment

As its fifth affirmative defense, St. Johns asserts that Modern and its predecessors in interest "abandoned the claimed drainage easement by not maintaining its drainage capability." (Doc. 74 at 11.)   As Modern points out in its memorandum, in order to prove abandonment of an easement, the servient owner must show conduct by the dominant owner "outwardly manifesting an intent to no longer use the easement, or conduct inconsistent with the continuance of the easement."  *Enos v. Casey Mountain, Inc.*, 532 So. 2d 703, 705 (Fla. 5th DCA 1988).  As support, St. Johns points to the affidavit of Ralph Brown (Doc. 209-29), a St. Johns engineer.  According to St. Johns, Brown's affidavit shows "the considerable deterioration of [Modern's] purported 'drainage system' through non-use and raises a material issue of fact in this regard."  (Doc. 297 at 19).

Brown's affidavit and accompanying exhibits total 39 pages.  St. Johns does not identify the portion(s) that allegedly demonstrate this deterioration.  However, a review shows that Brown performed a survey in February 1996 and found that one of the Refuge's primary drainage ditches (known as "NS-1") was "obstructed due to natural siltation and vegetative growth."  (Doc. 209-29 at 3).  Brown also refers in his affidavit to "occlusion, due to lack of maintenance over a period of about 40 years, of the ditches within the drainage system."  (Doc. 209-29 at 3).  However, so far as the Court can determine, he does not establish any basis for having personal knowledge as to the ditches' maintenance (or lack thereof) over the preceding decades or as to the amount of occlusion in the various ditches.  (Doc. 209-29 at 6).  Brown also refers in his affidavit to aerial photographs that allegedly show NS-1 may have been blocked in the early 1970s.  (Doc. 209-29 at 8).

In addition, Fish & Wildlife cites to its "1969 Biological Reconnaissance Report," which states that

> Approximately 18.5 miles of drainage ditches are in the area. These ditches are generally quite old, not maintained, 6-15 feet wide, and have quite a bit of vegetation in them. None of the ditches opened into the St. Johns River Channel properly but rather terminate at or below the 5 foot contour.

(Doc. 208-17 at 4).[18]   Fish & Wildlife also cites to a 1972 report that describes ditches that were built as part of a vegetable production project, which was later abandoned. (Doc. 298 at 17).

The evidence cited by St. Johns and Fish & Wildlife does not raise a genuine issue of material fact as to whether Modern or its predecessor abandoned any drainage easement they might have possessed. Evidence that the ditches making up the Drainage System deteriorated over the years is not the same as evidence that Modern or its predecessors took steps inconsistent with the continuance of an easement or otherwise affirmatively abandoned any easement rights. Moreover, for abandonment of an easement, all elements of an equitable estoppel must exist. *Wiggins v. Lykes Bros., Inc.*, 97 So.2d 273, 276 (Fla. 1957). "The essential elements of the doctrine of estoppel are: (1) a representation by the party estopped to the party claiming the estoppel as to some material fact, which representation is contrary to the conditions of affairs later asserted by the estopped party; (2) a reliance upon the representation by the party claiming the

---

[18]The Court's resolution of this motion and its responses have been hampered by the parties' failure to cite to exhibits and attachments as they are docketed, rather than as they were filed. For example, the quoted portion of the 1969 Biological Reconnaissance Report was cited as page 13 of Exhibit D to Exhibit 2 to Fish & Wildlife's motion for summary judgment, which is found at Docket number 215. In the docket, however, the quoted material is found at page 4 of Document 208-17. So that chambers staff does not have to pore through dozens of docket entries to determine whether quoted material has actually been made a part of the record, the parties should cite to the material as docketed whenever possible in future filings.

estoppel; and (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon." *Jewett v. Leisinger*, 655 So.2d 1210, 1212 (Fla. 4th DCA 1995). The evidence cited by St. Johns and Fish & Wildlife does not even arguably address the equitable estoppel elements.  At most the evidence shows nonuse. But nonuse alone "does not result in abandonment, and, as a general rule, an easement created by grant or reservation cannot be lost by mere nonuse for any length of time, no matter how great."  20 Fla. Jur. 2d Easements § 64.  As the Defendants have failed to raise a genuine issue of material fact in regard to the abandonment defense, Modern is entitled to summary judgment on this point.

### 8.    Adverse Possession

An easement may be terminated by adverse possession for the prescriptive period, which is seven years.  20 Fla. Jur. 2d Easements § 66.  Fish & Wildlife contends that Modern's easements "have been terminated by adverse possession by the United States government, including [Fish & Wildlife]".  (Doc. 77 at 8).  Modern contends that Fish & Wildlife "has never precluded use of the Drainage System for drainage until [Modern] attempted to clean out that portion of the Drainage System located on the Property."  (Doc. 289 at 28).  Fish & Wildlife responds with evidence, among other things, that since the 1970s it has posted boundary signs stating that unauthorized entry into the Refuge was prohibited; that it has had locked gates and "Area Closed" signs at each vehicle access point into the Refuge along Highway 50 since 1975; that it installed culverts in the Hacienda Road ditch and controlled its flow of water since 1976; and that it began plugging drainage ditches in the late 1970s.  (Doc. 298 at 18).  This evidence is sufficient to raise a genuine issue of material fact as to whether Fish & Wildlife extinguished any drainage easement Modern

may have possessed via adverse possession.  Modern is therefore not entitled to summary

judgment on this point.

### 9.        Merger

St. Johns admits that its recently completed title examination work has shown that the

doctrine of merger would not apply in this case.  (Doc. 297 at 19).  Still attempting to assert the

defense, Fish & Wildlife complains that Modern's position on this point has internal conflict, in

that it is arguing in one section of its motion that unity of title existed and in another section that it

never existed.  (Doc. 298 at 18-19).  However, Modern is not arguing that unity of title never

existed.  Instead, Modern argues that unity of title did not exist after the Property was severed

from the remainder of Titusville Farms – a prerequisite for the application of the merger

doctrine.[19]  Modern is entitled to summary judgment on this point.

### 10.        Res Judicata and Collateral Estoppel

St. Johns indicates that its intention in raising these defenses, which were already

addressed by the Court in an earlier order (Doc. 70), "is simply to preserve its position ... for

purpose of appeal."  (Doc. 297 at 20).  St. Johns adds that its position is that Modern's failure to

challenge certain permits issued by St. Johns renders those permits "res judicata and not subject to

collateral attack herein."  (Doc. 97 at 20).  In support of this latter point, which was not addressed

by the Court's earlier order, St. Johns cites three cases.  (Doc. 297 at 20 n. 24).  Aside from

providing one cryptic quotation, however, St. Johns does not explain how those cases support its

---

[19]"Obviously, a person cannot have an easement in his own land because an easement merges
with the title, and it follows that no easement exists so long as there is a unity of ownership of the
properties involved."  20 Fla. Jur. 2d Easements § 1.

argument, or even provide pinpoint citations to the portion(s) of those cases that purportedly address the issue at hand.  As such, St. Johns has not shown the existence of a genuine issue of material fact as to these defenses.

Fish & Wildlife – which was not a party to the earlier administrative proceedings – argues that the Eleventh Circuit Court of Appeals has identified certain exceptions to the mutuality-of-parties requirement for res judicata or collateral estoppel, rendering summary judgment on these defenses inappropriate.  (Doc. 298 at 19-20).  However, Fish & Wildlife makes no effort to argue that the instant case fits within one of these exceptions.  Modern is therefore entitled to summary judgment as to these defenses.

<u>11.	Marketable Record Title Act ("MRTA")</u>

Modern contends that the MRTA cannot operate to extinguish any drainage easement it might have because of Section 712.03(5), which provides that marketable record title will not extinguish

> [r]ecorded or unrecorded easements or rights, interest or servitude in the nature of easements, rights-of-way and terminal facilities, including those of a public utility or of a governmental agency, so long as the same are used and the use of any part thereof shall except from the operation hereof the right to the entire use thereof.

According to Modern, the easement interests in the Drainage System "have been used by various landowners throughout history [and] is still being used by [Modern], by the public, and by other landowners."  (Doc. 289 at 30).  However, there is at least some evidence – cited in Section 7 – that the various ditches making up the Drainage System were not in use for substantial periods of time, perhaps decades.  Because of the existence of a genuine issue of material fact regarding the

continued use of the Drainage System, Modern is not entitled to summary judgment on the MRTA defense.

## VI.    Conclusion

In consideration of the foregoing, it is hereby **ORDERED** and **ADJUDGED** that the Motion for Summary Judgment (Doc. 289) filed by the Plaintiffs, Modern, Inc. and First Omni Service Corp., is **GRANTED IN PART** and **DENIED IN PART**.  Summary judgment in Modern's favor is hereby **GRANTED** as to the defenses of failing to exhaust administrative remedies, sovereign immunity, statutory immunity, failure to mitigate, abandonment, merger, and res judicata/collateral estoppel, as described above.  In all other respects, the motion is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 8, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-28-