**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MODERN, INC., and
FIRST OMNI SERVICE CORP.,
                **Plaintiffs,**

-vs-                                                                   Case No. 6:03-cv-718-Orl-31KRS

STATE OF FLORIDA, DEPARTMENT OF
TRANSPORTATION, ST. JOHNS RIVER
WATER MANAGEMENT DISTRICT, and
UNITED STATES FISH & WILDLIFE
SERVICE,
                **Defendants.**

ST. JOHNS RIVER WATER
MANAGEMENT DISTRICT,

                **Third Party Plaintiff,**

vs.

THE GREAT OUTDOORS PREMIER
R.V./GOLF RESORT, INC.,

                **Third Party Defendant.**

## ORDER

This matter comes before the Court on the motion for summary judgment (Doc. 202) filed by Defendant Florida Department of Transportation ("FDOT"), the memorandum in opposition (Doc. 246) filed by the Plaintiffs, Modern, Inc. ("Modern") and First Omni Service Corporation ("First Omni"), and FDOT's reply (Doc. 271).

**I.     Background**[1]

The Plaintiffs own several parcels of real estate (the "Property"), totaling approximately 150 acres, in the area of the intersection of Interstate 95 ("I-95") and State Road 50 ("S.R. 50") near Titusville.  (Doc. 71 at 3).  The approximately 6,200-acre St. Johns National Wildlife Refuge (the "Refuge") is located to the west and north of the Property[2].  (Doc. 251 at 4).  The federally owned Refuge is managed by Defendant United States Fish & Wildlife Service ("Fish & Wildlife").  (Doc. 298 at 2).  Defendant St. Johns River Water Management District ("St. Johns") owns and manages two parcels of conservation land that abut the Refuge on portions of its western and southern boundaries, respectively. (Doc. 298 at 2-3).

The Property and the Refuge were, at one time, part of the Titusville Fruit and Farm Lands Subdivision ("Titusville Farms"), which was platted in the early 1900s.[3]  (Doc. 289 at 3).  The natural sheet flow of water on the Titusville Farms was generally from the northeast to the southwest, toward the St. Johns River, which passes near the southwest corner of the Refuge. (Doc. 289-4 at 2)  Over the years various canals were excavated on the Titusville Farms land to redirect the natural flow of surface water and drain it more efficiently.

---

[1]The facts underlying this dispute are set out in greater detail in this Court's order of March 8, 2006 (Doc. 318).

[2]The Refuge actually consists of two non-adjacent parcels – the Highway 50 Unit, which lies to the west and north of the Property, and the Beeline Unit, which is located far to the south of the Property. (Doc. 251 at 4-5).  The Beeline Unit is not relevant to this dispute, and therefore the term "Refuge" in this opinion will refer only to the Highway 50 Unit.

[3]The date of the platting is in dispute.  Modern contends it occurred in 1911.  (Doc. 289 at 3). Fish & Wildlife contends that the plat shows on its face that it was recorded in 1914.  (Doc. 251 at 2).

In the late 1980s and early 1990s, because of its plan to widen S.R. 50 along the southern edge of the Refuge – which would disturb area wetlands – FDOT was required to provide mitigation. (Doc. 202 at 6). FDOT, St. Johns, the Florida Department of Environmental Protection, and the United States Army Corp of Engineers agreed on a mitigation plan, which was funded by FDOT and performed by Fish & Wildlife on Refuge land. (Doc. 202 at 6). The mitigation involved filling in some canals and blocking some drainage culverts in the western area of the Refuge, near Hacienda Road. (Doc. 202 at 7). The Plaintiffs contend that this mitigation project (the "Hacienda Road Project"), which was completed in 1993, eventually caused (or contributed to) flooding on the Property.

The Plaintiffs filed suit in state court in 1997, seeking damages for the flooding under a number of theories. (Doc. 71 at 8). The state court dismissed their complaint and held the suit in abeyance until they exhausted their administrative remedies. (Doc. 71 at 8). After that process was completed, the Plaintiffs reinstituted the suit, which was subsequently removed to this Court. (Doc. 1). Now proceeding under their Fourth Amended Complaint, the Plaintiffs make inverse condemnation claims against St. Johns (Count I) and FDOT (Count II), request a declaratory judgment as to their drainage easement rights in the land controlled by those defendants (Count III), seek to quiet title under federal law against Fish & Wildlife (Count IV), and finally, in the alternative, demand permanent injunctive relief to prevent St. Johns and FDOT from interfering with the operation of the drainage ditches and requiring them to abate the flooding of the Property

(Count V). (Doc. 71). In its motion for summary judgment, FDOT seeks summary judgment as to the inverse condemnation claim in Count II and the injunctive relief requested in Count V.[4]

## II.     Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most

---

[4]FDOT also requests summary judgment in regard to the declaratory remedy sought by the Plaintiffs in Count III. (Doc. 202 at 2). Rather than make that argument itself, FDOT joins in the arguments raised by St. Johns in its motion for summary judgment. The Court will address that argument in its order resolving St. Johns' motion.

favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

**III.     Analysis**

   **A.     Inverse Condemnation**

The Florida Constitution provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Fla. Const. Art. 10 Sect. 6(a). In Count II, the Plaintiffs seek compensation on the grounds that FDOT has "caused the continuous or frequent physical invasion of Plaintiffs' drainage easements and the impoundment of surface waters on the Property so as to flood the Property and so as to raise the groundwater on the Property the effect of which is to deprive Plaintiffs of the economically beneficial use of its property and its appurtenant drainage easements." (Doc. 71 at 11). FDOT contends that the Plaintiffs have failed to establish the elements of their inverse condemnation claim. (Doc. 271 at 2).

FDOT first argues that the Plaintiffs have failed to prove that it caused a diversion of waters onto the Property. (Doc. 202 at 15). In addition, FDOT complains that when the Plaintiffs' flooding expert, Robert Sprinkle, analyzed the causes of the flooding of the Property, he failed consider the apparent degradation of the drainage ditches on the Refuge – something over which FDOT had no control – and therefore failed to eliminate the possibility that the flooding was caused by entities other than FDOT. (Doc. 202 at 15-16). However, both of these arguments fail as a matter of law. Rule 56 does not require the Plaintiffs to "prove" at this stage that FDOT

flooded the Property. Similarly, the Plaintiffs need not eliminate every other possible cause of the flooding, so long as they can raise a genuine issue of material fact as to whether FDOT was the cause, or at least one cause.[5] *See also Lost Tree Village Corp. v. City of Vero Beach*, 83 So.2d 561, 568 -69 (Fla. 4th DCA 2002) (holding that government entities may be held collectively responsible for a taking even if none of the governments' actions, considered individually, unconstitutionally infringed on property rights).

FDOT also contends that the Plaintiffs have failed to show that they have been deprived of the beneficial use of their land, and that the alleged flooding is permanent or continual. (Doc. 202 at 11). Along the same lines, FDOT argues that the Plaintiffs acquired thousands of acres of nearby property around the same time that it acquired the parcels making up the Property, and that they have sold portions of these other nearby tracts since the flooding began, including land "affected by the same wetland characteristics" as the land at issue in this suit. (Doc. 202 at 11-12). FDOT also contends that the Plaintiffs have not shown that they have been denied permits for development of the tracts making up the Property or that they are unable to develop their remaining property, even if flooding has converted it into wetlands. (Doc. 202 at 12-14).

However, the law distinguishes between "physical takings," caused by direct appropriation of private property or practical ouster of the owner's possession, and "regulatory takings," caused by excessive governmental regulation of private property. *Washoe County, Nev. v. U.S.*, 319 F.3d 1320, 1326 (Fed. Cir. 2003). "The clearest sort of taking occurs when the government encroaches

---

[5] It may be that FDOT's argument regarding Sprinkle's report was intended as an argument that the Plaintiffs failed to establish the existence of a genuine issue of material fact as to the cause of the flooding. If so, that argument also fails. FDOT has not provided any support for its bald assertion that Sprinkle neglected to consider the impact of deterioration of the Refuge's drainage ditches.

upon or occupies private land for its own proposed use. Our cases establish that even a minimal permanent physical occupation of real property requires compensation under the [Takings] Clause." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (internal quotation omitted). "[And] the Court [has] recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, 'while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.' *Id.* (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

As the Court points out in *Palazzolo*, a property owner may establish that a *regulatory* taking has occurred by demonstrating that government regulation denies all economically beneficial or productive use of the land. *Id.* However, although the Plaintiffs contend in Count II that FDOT's activities have deprived them "of the economically beneficial use of [the Property] and its appurtenant drainage easements," (Doc. 71 at 11), they are not complaining of a regulatory taking. Rather, they are asserting that a physical taking has occurred: that FDOT "has caused the continuous or frequent physical invasion of Plaintiffs' drainage easements and the impoundment of surface waters on the Property so as to flood the Property and so as to raise the groundwater on the Property". (Doc. 71 at 11). As such, they need not establish that the flooding has precluded all beneficial uses of the Property. "[W]here government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). Construction by the state which causes flooding on abutting private property may constitute a taking where the flooding is a "permanent invasion" of land amounting to an appropriation. *Kendry v. State Road Dept.*, 213 So.2d 23, 26-27 (Fla. 4th

DCA 1968). Flooding caused by diversion of rain water is permanent in the sense that rain is a condition that is reasonably expected to continually reoccur in the future. *Elliot v. Hernando County*, 281 So. 2d 395, 396 (Fla. 2d DCA). Because the Plaintiffs need not address the beneficial use issue, FDOT's allegations regarding other property sales by the Plaintiffs and their alleged failure to seek permits are not relevant.

FDOT next cites various evidence such as aerial photographs that, in its view, show that the Property has been "saturated" and a "wetland" for the past sixty years. (Doc. 202 at 16-17). FDOT contends that this evidence indicates that the water level on the Property "may be heightened not because of any action taken by [FDOT] but because the property is a marshy wetland" and that the Plaintiffs have failed to show that their land has been flooded, and failed to disprove that the Property naturally exhibits wetland characteristics. (Doc. 202 at 17). Again, however, at this stage the Plaintiffs need only demonstrate the existence of a genuine issue of material fact as to these points, notwithstanding any evidence FDOT may produce that suggests a different conclusion.

### B. Accrual of cause of action

FDOT contends that First Omni did not acquire its property until 1996, after the Hacienda Road Project had been completed and after Modern had first reported flooding to St. Johns. (Doc. 202 at 18). As such, FDOT argues, any taking that resulted from the Hacienda Road Project occurred prior to First Omni's acquisition of its portion of the Property, precluding it from pursuing an inverse condemnation claim. *See Department of Transportation v. Burnette*, 384 So.2d 916, 920 (Fla. 1st DCA 1980) ("[S]ince the Department acts and omissions affecting the asserted taking occurred before 1972, when Burnette acquired the [land at issue], it appears that

-8-

the asserted taking was not from Burnette at all, but from the two prior owners. . . . It is they who were deprived of rights in property, if anyone was, and it is to them that the Constitution secures full compensation for the taking.").

FDOT makes a similar argument as to the statute of limitations argument in regard to both plaintiffs – i.e., that their causes of action against FDOT for inverse condemnation accrued, at the latest, at the conclusion of the Hacienda Road Project in April 1993. (Doc. 202 at 19). Because the Plaintiffs did not institute their first suit until May of 1997, the argument goes, their claims are barred by the state's four-year statute of limitations for trespass and inverse condemnation claims. Fla. Stat. § 95.11(3).

The Plaintiffs respond that pursuant to the doctrine announced by the Supreme Court in the case of *U.S. v. Dickinson*, 331 U.S. 745 (1947), a cause of action for inverse condemnation does not accrue until the consequences of the government's actions stabilize and the damage from flooding becomes detectable to a reasonable degree of certainty. (Doc. 246 at 10). According to the Plaintiffs' version of events, the flooding of the Property did not stabilize for purposes of accrual of a cause of action until July of 2003, when the Plaintiffs completed the court-ordered infilling of some drainage ditches they had excavated in an effort to alleviate the flooding. (Doc. 202 at 10). It was only at that point, the Plaintiffs say, that they knew with reasonable certainty the extent to which the Property would flood. (Doc. 202 at 10).

FDOT complains that the Florida courts have not adopted the *Dickinson* stabilization doctrine. But the doctrine was followed by the First District Court of Appeals in *Millender v. Dep't of Transportation*, 774 So. 2d 767, 769 (Fla. 1st DCA 2000). In *Millender*, the state rerouted a river channel in 1975, causing erosion of the plaintiff's property. *Id.* at 768. Millender

built a sea wall and took other steps that successfully halted the erosion. *Id.* However, the Florida Department of Environmental Protection demanded that he tear down the sea wall. *Id.* In 1993, after eight years of litigation with FDEP over the sea wall, Millender was forced to remove it, and the erosion resumed. *Id.* Millender then brought suit against FDOT – 18 years after the rerouting of the river. *Id.* The trial court granted summary judgment for FDOT on statute of limitations grounds. *Id.*

The appellate court reversed, holding that the trial court should have applied the *Dickinson* doctrine. Following the rationale of the *Dickinson* court, the *Millender* court held that a plaintiff in Millender's position "should not be required to bring piecemeal actions" and that he or she could wait "until the consequences of state agency action 'so manifested themselves that a final account may be struck.'" *Id.* at 770 (quoting *Dickinson* at 749). The appellate court added that the "final account" in that case "could be struck only when another state agency prevented Millender from protecting his building from falling into the river." *Id.*

FDOT is correct that this state has not formally adopted the *Dickinson* doctrine. The Court's research has not uncovered any other decisions applying it, and the certified question to that effect posed by the *Millender* court – *i.e.,* "Does the doctrine stated in *United States v. Dickinson* ... apply in an appropriate Florida case so as to delay the accrual of an action for inverse condemnation and injunctive relief?" – was not answered by the Florida Supreme Court. *Id.* On the other hand, the Court has not uncovered any cases where a Florida appellate court has refused to apply the doctrine, and FDOT has not offered any legal or equitable justification for refusing to do so. This Court therefore sees no reason for refusing to apply it in this case. As such, there exists a genuine issue of material fact as to whether the Plaintiffs' causes of action accrued (and

any taking occurred) in July 2003, when the Plaintiffs were forced to undo the steps they had taken to eliminate the flooding.

### C.  Injunctive relief against trespass

Finally, FDOT argues that when there is no evidence that a separate tort exists apart from the alleged taking, there can be no recovery for trespass. (Doc. 202 at 20). There is a germ of truth in FDOT's contention. Even the Plaintiffs concede that a party cannot simultaneously recover for both trespass and inverse condemnation, because once the taking occurs, the government "owns" the land (albeit wrongly) and cannot trespass on it. *See*, *e.g.*, *County of Volusia v. W.R. Pickens*, 439 So. 2d 276, 278 (Fla. 5th DCA 1983). At this stage of the proceedings, however, the Plaintiffs may continue to assert alternative theories.

### IV.  Conclusion

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the motion for summary judgment (Doc. 202) filed by Defendant Florida Department of Transportation is **DENIED.**[6]

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 19, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Party

---

[6] As set forth above, the Court will resolve FDOTs' summary judgment argument regarding the declaratory judgment sought by the Plaintiffs in Count III in conjunction with its resolution of the motion for summary judgment filed by Defendant St. Johns.