# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MODERN, INC., and
FIRST OMNI SERVICE CORP.,
                         **Plaintiffs,**

-vs-                                          **Case No.  6:03-cv-718-Orl-31KRS**

STATE OF FLORIDA, DEPARTMENT OF
TRANSPORTATION, ST. JOHNS RIVER
WATER MANAGEMENT DISTRICT, and
UNITED STATES FISH & WILDLIFE
SERVICE,
                         **Defendants.**

_____

# ORDER

This matter comes before the Court on the motion for summary judgment (Doc. 204) filed

by Defendant St. Johns River Water Management District ("St. Johns"), the response (Doc. 247)

filed by the Plaintiffs, Modern, Inc. ("Modern") and First Omni Service Corp. ("First Omni"),

and the reply to that response (Doc. 269) filed by St. Johns.

## I.    Background

The Plaintiffs – henceforth referred to as "Modern" for simplicity's sake – and Defendants

St. Johns and United States Fish & Wildlife Service ("Fish & Wildlife") own or manage real estate

in the area of the intersection of Interstate 95 ("I-95") and State Road 50 ("S.R. 50") near Titusville.

Modern owns several parcels (collectively, the "Property") that are located, generally speaking,

adjacent to I-95 north of the intersection.  (Doc. 292).  According to Modern, the three tracts it

owns total approximately 142.5 acres of land.  (Doc. 71 at 3).  The approximately 6,200-acre St.

Johns National Wildlife Refuge (the "Refuge") is located, in pertinent part, to the west and north

of the Property[1]. (Doc. 251 at 4).  The federally owned Refuge is managed by Fish & Wildlife.

(Doc. 298 at 2).  St. Johns owns and manages two parcels of conservation land – the Seminole

Ranch and the Canaveral Marsh – which abut the Refuge on portions of its western and southern

boundaries, respectively. (Doc. 298 at 2-3).  The Seminole Ranch and Canaveral Marsh are owned

and managed by St. Johns.  (Doc. 289 at 2-3).

The Property and the Refuge were, at one time, part of the Titusville Fruit and Farm Lands

Subdivision ("Titusville Farms"), which was platted in the early 1900s.[2]  (Doc. 289 at 3).  The

natural sheet flow of water on the Titusville Farms was generally from the northeast to the

southwest, toward the St. Johns River, which passes near the southwest corner of the Refuge.

(Doc. 289-4 at 2)  Over the years various canals were excavated on the Titusville Farms land to

redirect the natural flow of surface water and drain it more efficiently.  Modern refers to these

canals as the "Drainage System."[3]  (Doc. 289 at 4).

In the 1970s, Fish & Wildlife began acquiring portions of Titusville Farms, creating the

Refuge in an (ultimately unsuccessful) effort to save the endangered Dusky Seaside Sparrow.

(Doc. 289 at 7).  Around the same time, St. Johns began acquiring property in and around

---

[1]The Refuge actually consists of two non-adjacent parcels – the Highway 50 Unit, which lies to the west and north of the Property, and the Beeline Unit, which is located far to the south of the Property. (Doc. 251 at 4-5).  The Beeline Unit is not relevant to this dispute, and therefore the term "Refuge" in this opinion will refer only to the Highway 50 Unit.

[2]The date of the platting is in dispute.  Modern contends it occurred in 1911.  (Doc. 289 at 3). Fish & Wildlife contends that the plat shows on its face that it was recorded in 1914.  (Doc. 251 at 2).

[3]Modern does not specify the locations or completion dates of the canals that it believes are or were part of the Drainage System.  While reserving judgment as to whether a "Drainage System" ever existed, the remainder of this opinion will utilize that term to refer to the drainage canals that now exist or existed at some time after 1911 on the land constituting Titusville Farms.

Titusville Farms to protect the St. Johns River.  (Doc. 289 at 8).  Over time, both Fish & Wildlife and St. Johns have taken steps such as filling in canals – or allowing others to fill them in – that have reduced the efficiency of the drainage on the land they manage and own, respectively.  (Doc. 289 at 10-12).

In the late 1980s and early 1990s, as a consequence of its plan to widen S.R. 50 along the southern edge of the Refuge – which widening would disturb area wetlands – Defendant Florida Department of Transportation ("FDOT") was required to provide mitigation.  (Doc. 202 at 6). FDOT, St. Johns, the Florida Department of Environmental Protection, and the United States Army Corp of Engineers agreed on a mitigation plan, which was funded by FDOT and performed by Fish & Wildlife on Refuge land.  (Doc. 202 at 6).  The mitigation involved filling in some canals and blocking some drainage culverts in the western area of the Refuge, near Hacienda Road.  (Doc. 202 at 7).  The Plaintiffs contend that this mitigation project (the "Hacienda Road Project"), which was completed in 1993, eventually caused (or contributed to) flooding on the Property.

The record is not entirely clear, but it appears that Modern acquired the Property via a series of transactions in the 1990s. (Doc. 71 at 19-82).  In 1996, Modern began complaining to St. Johns of flooding, allegedly caused by restriction and plugging of canals in and around the Refuge. (Doc. 292).  After a series of meetings between Modern and Brevard County, FDOT and Fish & Wildlife, a deal was worked out to have some canals that bordered the Refuge altered in an effort to eliminate the flooding of the Property.  (Doc. 292-4 at 2).

In February 1997, Modern performed what it described as maintenance of some ditches on and near the Property in an attempt to alleviate the flooding.  (Doc. 289 at 14).  Shortly thereafter,

Fish & Wildlife discovered that hundreds of acres of Refuge wetlands north of the intersection of S.R. 50 and I-95 had begun drying up.  (Doc. 292-5 at 2).  St. Johns concluded that Modern's ditch work went far beyond mere "maintenance" and had resulted in the draining.  (Doc. 292-6 at 2-3).  St. John's authorized Fish & Wildlife to construct two weirs to stop the draining and filed an administrative complaint seeking to have Modern undo the ditch work and restore the Refuge wetlands.  (Doc. 292-6 at 3).  Modern fought these measures, but in 2001 the First District Court of Appeal sided with St. Johns, upholding its determinations.[4]  (Doc. 292-6 at 3).

Modern had filed suit in state court in 1997, seeking damages for the flooding under a number of theories.  (Doc. 71 at 8).  The state court dismissed the complaint and held the suit in abeyance until Modern exhausted its administrative remedies.  (Doc. 71 at 8).  After the decision of the First District Court of Appeals, Modern reinstituted its damages suit, which was subsequently removed to this Court.  (Doc. 1).  Modern, now proceeding under its Fourth Amended Complaint, makes inverse condemnation claims against St. Johns (Count I) and FDOT (Count II), requests a declaratory judgment as to its drainage easement rights in the land controlled by those defendants (Count III), seeks to quiet title under federal law (28 U.S.C. § 2409a) against Fish & Wildlife (Count IV), and finally, in the alternative, demands permanent injunctive relief to prevent St. Johns and FDOT from interfering with the operation of the drainage ditches and requiring them to abate the flooding of the Property (Count V).  (Doc. 71).  St. Johns moves for summary judgment on all three counts against it.  (Doc. 204 at 1).

---

[4]Modern contends it had "substantially completed" the restoration by July 2003.  (Doc. 289 at 15).

## II.      Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### III.    Analysis

St. Johns begins its brief with its interpretation of Modern's theory of the case.  According to St. Johns, Modern is contending that permits issued by St. Johns and ditch-filling and other activities by the other Defendants have rendered by the Property useless by causing it to become wetlands, which Brevard County will not allow Modern to develop.  (Doc. 204 at 2).  St. Johns' summary judgment arguments are based, in large part, on this fundamental assumption.

Modern, however, responds that St. Johns has misinterpreted its theory of the case, and that it is not basing its taking claim on an alleged conversion of the Property, or an expected refusal by Brevard County to issue development permits.[5]  (Doc. 247 at 2).  Instead, Modern's theory is that St. Johns intended that the Property be flooded as part of its plan to restore the historic hydroperiod – i.e., the period of time in which it is covered by water – of the St. Johns River floodplain.  (Doc. 247 at 2).  According to Modern, St. Johns accomplished this by permitting Fish & Wildlife and other parties to degrade the Drainage System or by ordering parties to take actions that would have that effect.  (Doc. 247 at 2).

### A. Ripeness

Turning to the actual arguments presented in its memo, St. Johns first contends that Modern's claim is not ripe in that it is based upon an alleged inability to develop the Property, but Modern has never sought permits to do so.  (Doc. 31 at 5).  According to St. Johns, Florida law

---

[5]At other points in its memorandum St. Johns contends that Modern's claim is based, at least in part, on alleged negligence by St. Johns in issuing permits or orders.  Modern also denies that its case is based on any negligence on the part of St. Johns.  (Doc. 247 at 2).

requires "at least one meaningful permit application in order for an inverse condemnation claim to be ripe for adjudication." (Doc. 204 at 8).

However, as Modern points out in its response, and as this Court pointed out in its order denying St. Johns' motion to dismiss on essentially identical ripeness grounds, Modern's inverse condemnation claim is based on physical invasion of the Property by flood waters, not a permit denial. (Doc. 247 at 2; Doc. 70 at 20). As such, the "meaningful permit application" requirement is not applicable.

This is a physical takings case, not a regulatory takings case. *See Washoe County, Nev. v. U.S.*, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (explaining distinction between regulatory and physical takings). "[W]here government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). Construction by the state which causes flooding on abutting private property may constitute a taking where the flooding is a "permanent invasion" of land amounting to an appropriation. *Kendry v. State Road Dept.*, 213 So.2d 23, 26-27 (Fla. 4th DCA 1968). The cases cited by St. Johns, such as *Taylor v. Village of North Palm Beach*, 659 So. 2d 1167 (Fla. 4th DCA 1995), involve regulatory takings, where a landowner believes that a comprehensive plan or other land-use regulation has eliminated its ability to develop its property. In that situation, it is often the case that a number of factors (such as discretion on the part of permitting authorities or the landowner's ability to request and receive an amendment to a comprehensive plan) can make it impossible to determine whether the property has actually been taken. Stated differently, those factors make it impossible to conclude that the decision to take the property is final. Such finality

concerns are not present where the claim is that the government has flooded the property, and therefore no permit application is necessary.[6]

### B.      Sovereign immunity and permitting

St. Johns makes two arguments that sovereign immunity shields it from liability in this case: first, that permit issuance is a discretionary governmental activity for which the state of Florida has not waived sovereign immunity in Fla. Stat. § 768.28, and that Florida Statute § 373.443 provides St. Johns with immunity for any claim based on its approval of a permit.  (Doc. 204 at 10).  However, Modern's inverse condemnation claims are based on Article X, Section 6 of the Florida Constitution, which provides in pertinent part that no private property shall be taken by the state except for a public purpose and with full compensation paid to the owner.  The state's sovereign immunity is not applicable to a constitutional claim such as this one.  *See*, *e.g.*, *State Road Dept. v. Tharp*, 1 So. 2d 868, 869 (Fla. 1941) ("Immunity of the State from suit ... will not relieve the State against any illegal act for depriving a citizen of his property; neither will it be permitted as a plea to defeat the recovery of land or other property wrongfully taken by the State. . . . It will not be permitted as a City of refuge for a State agency which appropriates private property before the value has been fixed and paid.").  *See also Kempfer v. St. Johns River Water Management District*, 475 So. 2d 920, 924 (Fla. 5th DCA 1985) (noting in dicta that inverse condemnation claims may be brought against state despite lack of waiver of sovereign immunity in Fla. Stat. § 768.28 for such suits).

---

[6]It should also be noted that regulatory takings cases fall into two categories – facial challenges and as-applied challenges – and the *Taylor* court held that the "meaningful application" requirement for ripeness applied only to the latter category of challenges.  *Taylor* at 1172 n.3.  Thus, even in the context of regulatory takings, Florida courts do not always require a permit application.

St. Johns also argues that Modern has admitted it was not negligent in issuing the permits for any of the activities at issue in this suit, and that it did not do anything else, such as performing the construction, that could render it liable here, and that therefore Modern is attempting to impose strict liability on it for issuing those permits. (Doc. 204 at 10-11). Modern agrees that it is not claiming that St. Johns acted negligently. (Doc. 247 at 5). However, Modern contends that it seeks to impose liability on St. Johns not merely for issuing permits, but for intentionally causing flooding to the Property, via the issuance of permits and other steps, as part of its plan to restore the flood plain of the St. Johns River. (Doc. 247 at 5-6).

Further, the case law cited by St. Johns in support of this argument is not applicable to the instant case. For example, in *Yox v. City of Whittier*, 227 Cal. Rptr. 311 (Cal. Ct. App. 1986), the Court entered summary judgment for the city on the plaintiffs' inverse condemnation claim. The Court held that even if the city had been negligent in issuing permits to private parties that resulted in flooding/taking of the plaintiffs' property, the taking would not have occurred in pursuance of a "public use," as required for maintenance of an inverse condemnation claim. *Id.* at 314. In this instant case, Modern alleges that the taking was accomplished in pursuit of a public use: the restoration of the St. Johns flood plain and wetlands. (Doc. 247 at 5). Similarly, the cases cited by St. Johns[7] in which the governmental entity avoids inverse condemnation liability on the grounds

---

[7]*See, e.g.*, *Griggs v. Allegheny County*, 369 U.S. 84, 89 (1962) (finding United States not liable in inverse condemnation to plaintiff in airport's flight path because County, alone, decided "where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed.") *and Alves v. United States*, 133 F.3d 1454 (Fed. Cir. 1998) (finding no taking by government, which had authority but not responsibility to control plaintiffs' neighbors' livestock, where livestock "[we]re properly controlled in the first instance" by the neighbors).

that the "real" taker was the recipient of the permit are inapposite where, as here, St. Johns is alleged to have worked together with at least some of the permit recipients toward the goal of accomplishing the flooding of the Property.[8]

## C.   Permanence

Under Florida law, construction that causes flooding may constitute a taking where the flooding is a "permanent invasion of land amounting to an appropriation." *Kendry*, 213 So. 2d at 27-28. Flooding that falls short of this standard does not provide a basis for an inverse condemnation claim. *Id.* at 28. St. Johns argues that any flooding that has occurred as a result of its actions are not permanent, as a matter of law, "because the permits that the District issued to purportedly cause the rise in water levels are not permanent. They can be modified at any time upon request by the permit holder. . . . In addition, the District has the authority to initiate an action to require permit modification." (Doc. 204 at 24-25). St. Johns offers no precedential support for such a novel interpretation of the permanence requirement, and the Court finds no basis for adopting it. Changing the focus of the inquiry from the flooding to the *cause* of the flooding would effectively eliminate flooding-based inverse condemnation claims, as there is

---

[8]St. Johns also argues at length based on *Diamond K. Corp. v. Leon County*, 677 So.2d 90 (Fla. 1st DCA 1996) that it cannot be held liable. In that case, the trial court found, as a matter of law, that the defendant's discretionary enactment of stormwater runoff ordinances and subsequent permitting pursuant to those ordinances did not constitute a taking. (Doc. 209-27 at 7). The appellate court affirmed the trial court's decision. *Diamond K Corp.* at 90. However, the appellate court did so on the grounds that "the record below contains no evidence that any activity on the part of either [defendant] has permanently deprived Diamond K of all beneficial use of its property." *Id.* Because the First DCA did not address the trial court's conclusion that liability could not result from mere permit issuance, the *Diamond K. Corp.* decision does not support St. Johns' position. In addition, as discussed above, Modern alleges that St. Johns engaged in substantially more than mere permit issuance.

almost no flood-causing activity (e.g., building a wall, filling a drainage ditch, rerouting a river) that cannot be undone, just as St. Johns might undo its permit issuance.  The flooding resulting from such activities has always been considered permanent for purposes of an inverse condemnation proceeding.

### D.      Emergency Order

St. Johns next argues (Doc. 204 at 25-29) that it cannot be held liable for the emergency order it issued in 1997 for the construction of weirs in the drainage ditches known as NS-1 and EW-1 (the "Emergency Order").  The weir construction was intended to undo Modern's unauthorized excavation of those ditches.  (Doc. 71 at 8).  St. Johns argues that the prior legal proceedings on this point have demonstrated that the Emergency Order was legal; that the weirs did nothing more than restore the pre-excavation "status quo," and therefore cannot rightfully be said to have "caused" any flooding; and that, in any event, Modern has, pursuant to a court order, plugged NS1 to a level higher than that of the weirs, which therefore cannot be causing any flooding.  (Doc. 204 at 26-29).

Modern argues that St. Johns' argument is flawed in that it is based on a status quo of the Property being flooded.  (Doc. 247 at 13-14).  Modern further argues that it has proprietary interests in its (alleged) easements in the drainage ditches and in the administrative rules that (allegedly) allow it to excavate the affected ditches for maintenance purposes without a permit. (Doc. 247 at 14).  Modern contends that St. Johns can be held liable in inverse condemnation for refusing, under the guise of the Emergency Order, to allow Modern to exercise those rights.  (Doc. 247 at 14).  However, Modern does not explain why this Court should consider the status quo of the Property to have been anything other than "flooded" at the time the Emergency Order issued,

when Modern itself has explained that flooding is what caused it to excavate the ditches.  Modern

also fails to provide any precedential support for its (implicit) contention that preventing someone

from ameliorating the effects of flooding is the equivalent, for purposes of an inverse

condemnation claim, to having caused the flooding in the first place.[9]

Thus, it appears that St. Johns' argument on this point is meritorious.  However, as the

Emergency Order is only one of several acts allegedly causing flooding of the Property, St. Johns

has not shown that it is entitled to summary judgment on the inverse condemnation claim against

it.

### E.  Counts III and V

Finally, St. Johns argues that it is entitled to summary judgment on Count III, which seeks

a declaration as to the extent of Modern's drainage easement rights in opposition to both St. Johns

and FDOT, and on Count V, which seeks permanent injunctive relief to prevent St. Johns from

interfering with the Drainage System and to force it to abate the flooding of the Property.  (Doc.

204 at 29).

As to Count III, St. Johns argues that it has "no dog in the fight" as to Modern's alleged

drainage easement rights (except perhaps insofar as an absence of such rights might allow St.

Johns to prevail on the inverse condemnation count).[10]  (Doc. 204 at 29-30).  Under Florida law, a

_____

[9]Modern also attempts to argue that by asserting that the "status quo" of the Property is a flooded state, St. Johns is somehow seeking to redefine Modern's interest in the property.  This argument is not worthy of extended discussion.

[10]In its own motion, FDOT "joined in" the argument made by St. Johns in this motion, seeking summary judgment as to Count III on the same grounds as St. Johns but without reciting them in its own motion.  (Doc. 202 at 2).  Similarly, Modern opted to incorporate its responses to St. Johns as tis response to FDOT's argument on this point.  (Doc. 246 at 12).  The Court opted to resolve that portion

declaratory judgment proceeding must involve a justiciable controversy and a named defendant with an adverse position. *Jacobs & Goodman, P.A. v. McLin, Burnsed, Morrison, Johnson & Robuck, P.A.*, 582 So.2d 98, 100 (Fla. 5th DCA 1991).  Modern responds that St. Johns has always taken an adverse position as to Modern's easement rights to drain surface waters off the Property. (Doc. 247 at 17-18).  In support, Modern points to the following portion of an answer brief which St. Johns filed in the prior administrative proceeding:

> Modern argues that because it asserted in the administrative hearing that it had common law drainage easement rights over NS1 and EW1, then the nature and areal extent of those rights should have been determined before the ALJ could rule on whether Modern conducted an activity requiring a District permit.  Modern filed no exceptions to the ALJ's rulings that he had no jurisdiction to determine easement rights, and that even if Modern had such rights, they were subject to reasonable regulation by the District.  **Nonetheless, whether such easement rights existed is immaterial** to the determination that Modern conducted a regulated activity without the required District permit.  Even if Modern had such rights, all property rights are subject to valid police power regulation.  **Thus, the nature and areal extent of the asserted easement rights are irrelevant** to the conceded fact that Modern caused and directed the excavation activities in NS1 and EW1 which required a District permit.

(Doc. 253-4 at 46-47) (internal citations omitted and emphasis added).  The highlighted portions make it obvious that the quoted statement does not support Modern's position.  Rather than asserting that Modern has no easement rights, St. Johns states that the existence (or absence) of easement rights is "immaterial" or "irrelevant."  The quoted statement does not show St. Johns taking an adverse position regarding Modern's easement rights, and Modern offers no other evidence that St. Johns is a proper party to its declaratory judgment claim.  Therefore that count should be dismissed as to St. Johns.  Modern offers no argument or evidence that FDOT's position

---

of FDOT's motion along with its resolution of St. Johns' motion.  (Doc. 319 at 4).

in any way differs from that of St. Johns on this point, and therefore the count should also be dismissed as to FDOT.

As for Count V, St. Johns argues that it is entitled to summary judgment because that count relates to allegations that the Hacienda Road Project flooded the Property, but St. Johns' evidence shows that the project did not cause any flooding – and in any event it can modify the permits it issued for the Hacienda Road Project and thereby undo any negative effects.  (Doc. 204 at 30). Modern's expert takes a different position regarding the impact of the Hacienda Road Project on the Property's flood levels, raising a genuine issue of material fact that precludes the entry of summary judgment for St. Johns.  And St. Johns' ability to modify the permits is irrelevant to the issues of whether it has committed a trespass and whether it ought to be enjoined from doing so in the future.  St. Johns is not entitled to summary judgment as to Count V.[11]

---

[11]St. Johns also argues that, "for the reasons stated in Section III" of its memorandum, it "is not liable in tort if it is determined that the permit was negligently issued."  (Doc. 204 at 30).  Section III is 14 pages long and covers numerous legal issues, and St. Johns does not specify which points support its entitlement to summary judgment on Count V, or how they do so.

IV.      **Conclusion**

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the

motion for summary judgment (Doc. 204) filed by Defendant St. Johns River Water Management

District is **GRANTED IN PART** and **DENIED IN PART**.  Count III is **DISMISSED**.  In all

other respects, the motion is **DENIED.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 6, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party