**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MODERN, INC., and**
**FIRST OMNI SERVICE CORP.,**
        **Plaintiffs,**

**-vs-**     Case No. 6:03-cv-718-Orl-31KRS

**STATE OF FLORIDA, DEPARTMENT OF**
**TRANSPORTATION, ST. JOHNS RIVER**
**WATER MANAGEMENT DISTRICT, and**
**UNITED STATES FISH & WILDLIFE**
**SERVICE,**
        **Defendants.**

## ORDER

This matter comes before the Court on the motion to dismiss or, in the alternative, for summary judgment (Doc. 215) filed by Defendant United States Fish & Wildlife Service ("Fish & Wildlife"), the response (Doc. 243) filed by the Plaintiffs, Modern, Inc. ("Modern") and First Omni Service Corp. ("First Omni"), and the reply (Doc. 276) filed by Fish & Wildlife.

**I.     Background**

The Plaintiffs – henceforth referred to as "Modern" for ease of reference – and Defendants Fish & Wildlife and St. Johns River Water Management District ("St. Johns") own or manage real estate in the area of the intersection of Interstate 95 ("I-95") and State Road 50 ("S.R. 50") near Titusville. Modern owns several parcels (collectively, the "Property") that are located, in general terms, adjacent to I-95 north of the intersection. (Doc. 292). According to Modern, the three tracts it owns total approximately 142.5 acres of land. (Doc. 71 at 3). The approximately 6,200-

acre St. Johns National Wildlife Refuge (the "Refuge") is located to the west and north of the Property[1]. (Doc. 251 at 4). The federally owned Refuge is managed by Fish & Wildlife. (Doc. 298 at 2). St. Johns owns and manages two parcels of conservation land – the Seminole Ranch and the Canaveral Marsh – which abut the Refuge on portions of its western and southern boundaries, respectively. (Doc. 298 at 2-3).

The Property and the Refuge were, at one time, part of the Titusville Fruit and Farm Lands Subdivision ("Titusville Farms"), which was platted in the early 1900s.[2] (Doc. 289 at 3). The natural sheet flow of water on the Titusville Farms was generally from the northeast to the southwest, toward the St. Johns River, which passes near the southwest corner of the Refuge. (Doc. 289-4 at 2) Over the years various canals were excavated on the Titusville Farms land to redirect the natural flow of surface water and drain it more efficiently. Modern refers to these canals as the "Drainage System."[3] (Doc. 289 at 4).

In the 1970s, Fish & Wildlife began acquiring portions of Titusville Farms, creating the Refuge in an (ultimately unsuccessful) effort to save the endangered Dusky Seaside Sparrow. (Doc. 289 at 7). Around the same time, St. Johns began acquiring property in and around

---

[1]The Refuge actually consists of two non-adjacent parcels – the Highway 50 Unit, which lies to the west and north of the Property, and the Beeline Unit, which is located far to the south of the Property. (Doc. 251 at 4-5). The Beeline Unit is not relevant to this dispute, and therefore the term "Refuge" in this opinion will refer only to the Highway 50 Unit.

[2]The date of the platting is in dispute. Modern contends it occurred in 1911. (Doc. 289 at 3). Fish & Wildlife contends that the plat shows on its face that it was recorded in 1914. (Doc. 251 at 2).

[3]Modern does not specify the locations or completion dates of the canals that it believes are or were part of the Drainage System. While reserving judgment as to whether a "Drainage System" ever existed, the remainder of this opinion will utilize that term to refer to the drainage canals that now exist or existed at some time after 1911 on the land constituting Titusville Farms.

Titusville Farms to protect the St. Johns River. (Doc. 289 at 8). Over time, both Fish & Wildlife and St. Johns have taken steps such as filling in canals – or allowing others to fill them in – that have reduced the efficiency of the drainage on the land they manage and own, respectively. (Doc. 289 at 10-12).

The record is not entirely clear, but it appears that Modern acquired the Property via a series of transactions in the 1990s. (Doc. 71 at 19-82). In 1996, Modern began complaining to St. Johns of flooding, allegedly caused by restriction and plugging of canals in and around the Refuge. (Doc. 292). After a series of meetings between Modern and Brevard County, the Florida Department of Transportation, and Fish & Wildlife, a deal was worked out to have some canals that bordered the Refuge altered in an effort to eliminate the flooding of the Property. (Doc. 292-4 at 2).

In February 1997, Modern performed what it described as maintenance of some ditches on and near the Property in an attempt to alleviate the flooding. (Doc. 289 at 14). Shortly thereafter, Fish & Wildlife discovered that hundreds of acres of Refuge wetlands north of the intersection of S.R. 50 and I-95 had begun drying up. (Doc. 292-5 at 2). St. Johns concluded that Modern's ditch work went far beyond mere "maintenance" and had resulted in the draining. (Doc. 292-6 at 2-3). St. Johns authorized Fish & Wildlife to construct two weirs to stop the draining and filed an administrative complaint seeking to have Modern undo the ditch work and restore the Refuge wetlands. (Doc. 292-6 at 3). Modern fought these measures, but in 2001 the First District Court of Appeal sided with St. Johns, upholding its determinations.[4] (Doc. 292-6 at 3).

---

[4] Modern contends it had "substantially completed" the restoration by July 2003. (Doc. 289 at 15).

Modern had filed suit in state court in 1997, seeking damages for the flooding under a number of theories. (Doc. 71 at 8). The state court dismissed the complaint and held the suit in abeyance until Modern exhausted its administrative remedies. (Doc. 71 at 8). After the decision of the First District Court of Appeals, Modern reinstituted its damages suit, which was subsequently removed to this Court. (Doc. 1). Modern, now proceeding under its Fourth Amended Complaint, makes inverse condemnation claims against St. Johns (Count I) and FDOT (Count II), requests a declaratory judgment as to its drainage easement rights in the land controlled by those defendants (Count III),[5] seeks to quiet title under federal law (28 U.S.C. § 2409a) against Fish & Wildlife (Count IV), and finally, in the alternative, demands permanent injunctive relief to prevent St. Johns and FDOT from interfering with the operation of the drainage ditches and requiring them to abate the flooding of the Property (Count V). (Doc. 71). In Count IV – the only Count targeting Fish & Wildlife directly – Modern seeks to have this Court adjudicate the existence, location, scope and extent of its drainage easements within the Refuge, as well as declaring that Fish & Wildlife has interfered with those easements. (Doc. 71 at 14).

**II.     Standards**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

---

[5]This Count was recently dismissed. (Doc. 330 at 15).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

**III.   Analysis**

Generally speaking, an easement is the right in the owner of one parcel of land (known as the "dominant estate"), by reason of such ownership, to the unfettered use of the property of another (known as the "servient estate") for a special purpose not inconsistent with the general property rights of the owner. *See*, *e.g.*, *Easton v. Appler*, 548 So. 2d 691, 694 (Fla. 3d DCA 1989). Easements may be created by express grant, by implication, or by prescription. *American Quick Sign, Inc. v. Reinhardt*, 899 So. 2d 461, 465 (Fla. 5th DCA 2005). An express easement may be

created by way of a grant contained in a deed or other written document. *Id.* at 464-65. An implied easement may arise from an implied reservation in a deed, from a conveyance with reference to a plat or map showing streets or ways, or as a way of necessity. 20 Fla. Jur. 2d Easements § 25. Once created, an easement is transferred with the dominant estate even if not mentioned in the instrument of transfer. *Behm v. Saeli*, 560 So. 2d 431, 432 (Fla. 5th DCA 1990).

Modern contends that it enjoys express, common law and implied drainage easements within the Refuge. (Doc. 71 at 13). Fish & Wildlife offers five arguments against the existence of such easements, as well as three arguments for dismissal of the suit against it in its entirety. Each of these arguments is addressed below.[6]

### A.   Plat language

Fish & Wildlife argues that the owners of Titusville Farms did not intend to establish easements for ditches when they set out rights of way for roads in the Plat. (Doc. 215 at 18). Fish & Wildlife's evidence on that score is that a 1917 deed from Titusville Farms that conveyed the land "subject to right of way, as shown by said plat for public roads, and excepting right of way for necessary ditches." (Doc. 215 at 18). In the view of Fish & Wildlife, this shows that the owners of Titusville Farms distinguished between roads and drainage ditches, and their dedication of roads on the Plat would therefore not have been intended as dedications of off-road drainage ditches. (Doc. 215 at 18). The Court finds that, although this may be evidence of what the Titusville Farms owners meant when they used the term road on the Plat, it is hardly determinative, if for no other

---

[6]Fish & Wildlife first attempts to argue that the term "road" is not ambiguous and can not, as a matter of law, encompass ditches for off-road drainage. (Doc. 215 at 14-17). As Fish & Wildlife notes in its motion (Doc. 215 at 14 n.3), the Court has already ruled that "road" as used in the Plat is ambiguous. (Doc. 70 at 25). The Court declines the invitation to reconsider that finding.

reason than the fact that the deed and the Plat were created years apart.  Fish & Wildlife has not established its entitlement to summary judgment on this point.

      **B.**     **Public dedication and acceptance**

Modern contends that it, as a member of the general public, has easement rights in the Drainage System because the canals making it up were dedicated in the plat by common law to the public at large.  (Doc. 289 at 16).  Common law dedication is the setting apart of land for public use.  *Brevard County v. Blasky*, 875 So. 2d 6, 10 (Fla. 5th DCA 2004).  "To constitute a dedication, whether an express dedication or an implied dedication, there must first be shown a clear intention by the owner, as indicated by his or her words or acts, to offer the land for public use.  Thereafter, there must be an acceptance of the dedication by the public."  *Id.*  The party asserting the existence of the dedication bears the burden of proof and must present "clear and unequivocal" evidence of an intention to dedicate.  *Id.*  Acceptance of the dedication need not be formal, but may be implied from the public's improving or repairing the offered area, "or from any other act with respect to the subject matter that clearly indicates an acceptance."  *Smith v. City of Melbourne*, 211 So. 2d 66, 68 (Fla. 4th DCA 1968).

In its motion, Fish & Wildlife argues that, even assuming that the plat constituted an offer to dedicate the Drainage System to the public, there is no evidence that Brevard County ever accepted the dedication.  (Doc. 215 at 18-20).  In response, Modern reasserts its arguments from its own motion for summary judgment, in which it argued the following: that in 1967, Brevard County vacated and abandoned certain portions of the rights-of-way referenced on the Plat (Doc. 292-9); that in 1974, Brevard County's Public Works Division informed Fish & Wildlife that the division would recommend refusal by the Board of County Commissioners of any request that the

County vacate (unspecified) rights-of-way in the Refuge[7] (Doc. 291-2 at 2); that in 1978 Brevard County allegedly refused to vacate some rights-of-way because they were dedicated to facilitate drainage in the area[8]; that in 1987, the city of Titusville formally vacated a portion of the rights-of-way and transferred title to FDOT for improvements to S.R. 50 (Doc. 292-10);[9] and that in 2001, Brevard County opined regarding the rights-of-way that "public drainage is routed through and is dependent on existing conveyances in the Refuge."[10] (Doc. 289 at 17-18). Finally, Modern argues that Brevard County's refusal to vacate the Plat implies that Brevard claims an interest in it. (Doc. 289 at 18). The evidence Modern offers is, at best, ambiguous. For example, the county's act of vacating rights of way is consistent with having previously accepted the dedication, but it is equally consistent with a willingness to "sign away," for purposes of clearing title, property rights that the county never possessed (or believed it possessed). Despite its evidence not being determinative, however, Modern has provided sufficient evidence to survive summary judgment on this point.

---

[7] There is no suggestion that Fish & Wildlife ever presented this request to the Board itself or that the Board ever considered whether the County ought to vacate any rights-fo-way in the Refuge.

[8] Modern does not provide a record citation to support this contention. (Doc. 289 at 17).

[9] It is not clear what property rights the transaction involved. The resolution accomplishing the transaction (Doc. 292-10 at 2) does not describe the property in detail, and key portions of the accompanying deed (Doc. 292-10 at 3-4) are illegible. As such, the Court cannot discern how this transaction might support Modern's argument that an acceptance of the Drainage System occurred.

[10] Modern does not provide a record citation to support this contention. (Doc. 289 at 18).

### C.       Rerouting of implied easement

Florida law provides that an owner of a lot who purchases property in reliance on a plat showing streets running through the subdivision acquires a private implied easement over such streets shown in the plat which reasonably benefit the owner's land. *Enos v. Casey Mountain, Inc.*, 532 So. 2d 703, 705 (Fla. 5th DCA 1988). In some cases where it has been determined that a party is entitled to such an implied easement, courts have rerouted the easement to a location other than that specified on the plat. In *Casey Mountain*, for example, the plaintiff had been using a particular path to access its property, mistakenly thinking that the path ran across a platted easement. *Id.* at 706. The actual platted easement was located some distance away from the path the plaintiff was using, and the defendant had built "valuable improvements" – such as landscaping and part of a conference center – across the platted easement. *Id.* The Fifth District Court of Appeals held that the plaintiff was entitled to an implied easement, but that it would be inequitable to require removal or demolition of the improvements built by the defendant. *Id.* As such, the court remanded the case to the trial court with directions to "relocate and establish a substitute implied easement" for the plaintiffs. *Id.*

Fish & Wildlife contends that the Refuge "is an important environmental resource which is certainly as important as the structures blocking the platted easements" in *Casey Mountain*, and therefore "any implied easement for the alleged drainage ditches would have to be routed around the Refuge rather than through the Refuge". This argument fails for several reasons. First, there is no showing that Fish & Wildlife has built any "valuable improvements," such as buildings, on the Refuge. Second, there has been no showing that utilization of the Drainage System by Modern would necessarily harm the Refuge in a manner analogous to the destruction of the improvements

-9-

in *Casey Mountain*. Most problematic, however, is that Fish & Wildlife is asserting a right to shift any implied easement off its own property and onto that of some third party. Fish & Wildlife has not pointed to any case law that would permit such an inequitable result.

### D. Easements by way of predecessors' deeds

Modern contends that it has an easement appurtenant in the Drainage System pursuant to deeds from its predecessors in interest. (Doc. 289 at 19). Two of the deeds at issue – the 1915 and 1917 deeds – provide that the conveyances are "subject to right of way, as shown by said plat for public roads, and excepting rights of way for necessary ditches." (Doc. 215 at 22-23). Fish & Wildlife notes, however, that an exception is not intended to create a property right; rather, an exception severs some part of the property right being granted. *See*, *e.g., City of Jacksonville v. Shaffer*, 144 So. 888, 890 (Fla. 1932). A reservation, on the other hand, "is the creation in behalf of the grantors of a new right issuing out of the thing granted, something which did not exist as an independent right before the grant." *Id.* Fish & Wildlife argues that because the deeds described exceptions rather than reservations, they could not have created easements. (Doc. 215 at 23).

However, the distinction between an exception and a reservation is not as definitive as Fish & Wildlife would have it. Florida courts recognize that, although there is a technical distinction between an exception and a reservation, "the use of one or the other of the terms is not conclusive as to the nature of the grant." *Copello v. Hart*, 293 So. 2d 734, 737 (Fla. 1st DCA 1974). Rather, the technical meaning of the term used "must yield to the manifest intention of the parties." *Id.* Fish & Wildlife offers no argument regarding the intent of the parties and therefore is not entitled to summary judgment on this point.

More effective is Fish & Wildlife's argument that the 1915 and 1917 deeds are too ambiguous in regard to the property right conveyed. Under Florida law, a deed or other instrument must describe the property such that it is evident that a particular parcel, and not a different or unspecified one, is to be conveyed. *Mendelson v. Great Western Bank, F.S.B.,* 712 So. 2d 1194, 1196 (Fla. 2d DCA 1998). "The rule is that a description is sufficient if, by relying on the description read in light of all the facts and circumstances referred to in the instrument, a surveyor could locate the land." *Id.* But if the instrument's description of the property is patently ambiguous, and the instrument furnishes no other information from which the parties' intention can be gleaned, the attempted conveyance is void, and parol evidence may not be employed to cure the deficiency. *Id.* In the instant case, the description "necessary ditches" is clearly insufficient on its own to identify the drainage easement(s) allegedly conveyed by the 1915 and 1917 deeds. Modern provides no argument that other facts and circumstances referred to in the deeds can cure this deficiency – indeed, Modern has not addressed this argument at all in its response.

The third deed upon which Modern relies to establish an implied easement – the 1957 deed – provides that "the parties mutually have the right to enter on any part of the adjoining lands from time to time for the purpose of keeping the drainage ditches open and to work the roads." (Doc. 215 at 23). Fish & Wildlife contends that this language establishes only a right of ingress and egress, not a drainage easement. In response, Modern adopts its argument regarding the 1957 deed from its motion for summary judgment. (Doc. 243 at 12). In its motion for summary judgment, however, Modern made a different argument. Essentially Modern argued that the language of the 1957 deed and other evidence showed that the Drainage System was in use and necessary when unity of title was severed, therefore creating an implied easement. (Doc. 289 at

-11-

20). This unity of title argument, while still available to Modern at trial, does nothing to rebut Fish & Wildlife's argument that the 1957 deed did not itself establish an implied easement. Fish & Wildlife is entitled to summary judgment on Modern's claims that the language of the 1915, 1917, or 1957 deeds creates an implied easement.

### E.    Common law flowage easement

Florida follows what is known as the "reasonable use" rule with regard to surface waters. *Westland Skating Center, Inc. v. Gus Machado Buick, Inc.*, 542 So. 2d 959, 962 (Fla. 1989). "Under this rule, a possessor of land is not unqualifiedly entitled to deal with surface waters as he pleases nor is he absolutely prohibited from increasing or interfering with the natural flow of surface waters to the detriment of others." *Id.* at 961. "Each possessor is legally privileged to make reasonable use of his land even though the flow of surface waters is altered thereby and causes some harm to others. He incurs liability only when his harmful interference with the flow of surface waters is unreasonable." *Id.*

Despite Florida's adoption of the reasonable use rule, an upper landowner in this state continues to enjoy an easement across the lower tract for all naturally occurring surface water so long as the land remains in its natural state. *Id.* at 963. However, when any party improves his land, thereby causing surface waters to damage his neighbor's property, the reasonable use rule applies. *Id.*

Fish & Wildlife, while not denying that Modern, as an upper landowner, possesses a common law easement for natural water flow, denies that such an easement (or the reasonable use rule) applies in this case. (Doc. 215 at 24). Fish & Wildlife contends that its efforts have been confined to restoring the natural flow of water, rather than interfering with it. (Doc. 215 at 24).

-12-

Modern responds that the reasonable use rule "applies in this case to preclude [Fish & Wildlife] or anyone else from precluding [Modern] from maintaining the portions of the Drainage System located on the Property to channel impounded waters" and adds that it has the right "to channel waters off the Property, through the Refuge – as a common law flowage easement or under the reasonable use rule – and into the St. Johns River."  (Doc. 243 at 14).  Even if true, these arguments are not responsive to Fish & Wildlife's argument that it has done nothing to interfere with the *natural* flow of water off the Property.  **Fish & Wildlife is entitled to summary judgment on this point.**

### F. Failure to join indispensable parties

Rule 19(a) of the Federal Rules of Civil Procedure requires the joinder, if feasible, of certain parties (1) if complete relief cannot be afforded in their absence or (2) if they claim an interest relating to the subject of the suit that may be impaired in their absence or that might expose a party to a substantial risk of inconsistent obligations.  Fish & Wildlife contends that the drainage easements claimed by Modern extend into numerous properties aside from those owned by the current parties, and argues that those additional property owners are all indispensable parties.  (Doc. 215 at 25-26).  However, Fish & Wildlife has not made a showing that these additional property owners will necessarily be bound by the results of these proceedings, and therefore there is no showing that these other property owners have rights that may be impaired in their absence.  Fish & Wildlife has failed to show that these additional property owners are indispensable parties.


### G. Statute of limitations

The Quiet Title Act ("QTA") has a twelve-year statute of limitations, which begins to run when the plaintiff or the plaintiff's predecessor in interest knew or should have known of the government's claim to the property at issue. 28 U.S.C. § 2409a(g). Fish & Wildlife contends that Modern's predecessors in interest must have seen the government's "No Trespassing" signs along the borders of the Refuge and must have noticed the government's efforts to plug and otherwise interfere with the Refuge's drainage ditches, including the Hacienda Road ditch and other lateral canals, all of which occurred prior to 1980. (Doc. 215 at 27-28). However, questions of fact such as what signs a non-party saw or should have seen 25 years ago, are particularly ill-suited for resolution by way of a motion to dismiss or motion for summary judgment.

### H. Inferred tort claims

Fish & Wildlife complains that, while Modern is seeking to have this Court declare that it interfered with Modern's drainage easements, the proper remedy for such interference under Florida law is an action in tort. (Doc. 215 at 30). Further, Fish & Wildlife contends that any tort claims Modern might have against it are precluded for procedural reasons. (Doc. 215 at 30). The Court need not resolve Fish & Wildlife's procedural argument. Modern is asserting a Quiet Title Act claim, not a tort claim. To the extent that the Quiet Title Act permits the sort of declaration Modern now seeks – a point neither party has addressed – Modern's failure to meet the procedural requirements for a tort claim is no bar. To the extent such an adjudication is only available in tort, there is no claim to dismiss, as Modern has not raised a tort claim.

**IV.     Conclusion**

In consideration of the foregoing, the motion to dismiss or, in the alternative, for summary judgment (Doc. 215) filed by Defendant United States Fish & Wildlife Service is **GRANTED IN PART** and **DENIED IN PART**, as detailed above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 17, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party