# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MODERN, INC., and**
**FIRST OMNI SERVICE CORP.,**
                **Plaintiffs,**

**-vs-**                                      **Case No.  6:03-cv-718-Orl-31KRS**

**STATE OF FLORIDA, DEPARTMENT OF**
**TRANSPORTATION, ST. JOHNS RIVER**
**WATER MANAGEMENT DISTRICT, and**
**UNITED STATES OF AMERICA,**

**Defendants.**

_____

## MEMORANDUM OPINION

The dusky seaside sparrow, *Ammodramus maritimus nigrescens*, was a native, non-migratory bird that lived in the salt marshes of Brevard County.  Pollution, pesticides, and loss of habitat – caused by, among other things, drainage of marshes it used as nesting grounds – caused its numbers to decline.  In 1967, the dusky was placed on the original federal list of endangered species.  Shortly thereafter, the federal government began acquiring property and attempting to restore the dusky's habitat so as to save it from extinction.

Despite these efforts, the species continued its decline.  By 1979, only six duskies were known to exist.  The last known dusky seaside sparrow died, in captivity, in 1987, and the species was officially declared extinct in 1990

It has been said that no good deed goes unpunished.  Consistent with this aphorism, the government's effort to save the dusky is the genesis of this protracted dispute.

I.      **Background**

A.      **Titusville Fruit and the St. Johns River**

In the early 1900s, a group of investors formed the Titusville Fruit and Farm Lands

Company ("Titusville Fruit").  In 1911, the company drew up a plat for a 12,800-acre subdivision

(the "Titusville Fruit Tract") in the flood plain of the St. Johns River in North Brevard County.

The plat was recorded in the public records of Brevard County 1914.  (Doc. 70 at 4).  The platted

tract was roughly rectangular, approximately five miles east to west and four miles north to south.

By reference to modern-day landmarks, it stretched from near Titusville west almost to the St.

Johns River, and from about a mile south of State Road 50 to about a mile north of Satterfield

Road.[1]

The Titusville Fruit Tract consisted largely of flat marshland.  The natural surface flow (or

"sheet flow") of water across the tract was generally from the northeast to the southwest, toward

the river.  To improve drainage and allow as much as possible of the tract to be farmed, Titusville

Fruit built a network of intersecting north-south and east-west drainage canals and ditches (the

"Drainage System") throughout most of the tract.  Based on contemporary newspaper articles and

old surveys, the construction of the Drainage System began around 1911 and continued at least

through 1919.[2]  (Tr. 360).  The canals ran along the borders and down the centers of most of the

---

[1]A map of the area is attached to this opinion.

[2]The Plaintiffs contend that construction of the Drainage System was "essentially complete"
by 1914, but the Plaintiffs' expert testified that construction continued until 1919.  (Tr. 360-61).
Although the testimony suggested that some if not all of the construction after 1914 consisted of
expansion of canals dug previously, the fact of such expansion suggests the system was not
"complete."  If the system had been functioning as intended, expanding the canals would have been
unnecessary.  Aerial photographs show that some canals were being enlarged as late as the period

-2-

one-square-mile sections that had been laid out on the plat, running through areas that had been designated for roads.  (Tr. 365).[3]

State Road 50 – then known as Old Cheney Highway – was completed across the Titusville Fruit Tract in the 1920s.  Interstate 95, which bisects the old Titusville Fruit Tract from north to south, about one-quarter of the way in from its eastern edge, was built in the mid-1960s.  (Tr. 394). Culverts were placed to allow existing canals to flow westerly beneath the interstate.  Hacienda Road, which runs from Highway 50 to Satterfield Road about a quarter of the way in from the western edge of the old Titusville Fruit Tract, was also built in the 1960s.  (Tr. 394).  As was the case with Interstate 95, culverts were installed beneath Hacienda Road where the newly built road intersected with existing canals.  (Tr. 395).

In 1971, as part of its effort to save the dusky seaside sparrow, the United States established the St. Johns National Wildlife Refuge (the "Refuge"), acquiring the property by

---

between 1943 and 1951.  (Tr. 375-76).

[3]Although many additional canals exist on the tract or did in the past, only a handful are pertinent to the instant dispute: Of the east-west canals, there is EW1, which runs about a half mile north of State Road 50, EW1.5, which parallels EW1 a half mile farther north, EW2 or the Satterfield Canal, which parallels EW1.5 a half mile to the north along the south side of Satterfield Road, the Indian River City Canal ("IRCC"), which runs along the north side of State Road 50, and the Addison Canal, which runs along the south edge of the eastern half of the plotted tract before veering southwest to connect directly to the St. Johns.  (The IRCC was built after most of the canals at issue in this case, sometime between 1943 and 1951.  (Tr. 376)).  Historically, the east-west canals all extended from east of what is now Interstate 95 to some distance west of Hacienda Road, where they stopped before reaching the St. Johns River.  Of the north-south canals, the most relevant are NS1, which runs from the southerly Satterfield Canal to the Addison Canal about a quarter mile west of Interstate 95; NS2, which does the same one half mile further west; and the ditch that runs along the east side of Hacienda Road.

purchase or condemnation.[4]   All but the westernmost portion of the Refuge consists of land that had been part of the old Titusville Fruit Tract.   Generally speaking, the Refuge extends north from State Road 50 to Satterfield Road and west from Interstate 95 about 3.5 miles toward the St. Johns River.   An additional 225 acres of the Refuge lie north of Satterfield Road.   About 100 acres of what would otherwise be the southeast corner of the Refuge are in private hands.   The Refuge occupies a substantial portion – approximately 45 percent – of the old Titusville Fruit Tract, and a substantial portion of the Drainage System (or its remnants) runs across it.

The dusky seaside sparrow's preferred habitat was what is referred to as an ephemeral salt marsh, an area temporarily flooded during the year and dominated by *Spartina* or cordgrass rather than the taller shrubs and trees that dominated drier portions of the Refuge.   (Tr. 512).   Shortly after the establishment of the Refuge, the United States Fish and Wildlife Service ("Fish & Wildlife") began trying to restore the property's natural sheet flow and hydroperiod.[5]   (Tr. 551).   Fish & Wildlife blocked the culverts under Hacienda Road with plywood (Tr. 541).   Fish & Wildlife also plugged the east-west canals about every eighth of a mile west of Hacienda Road by

---

[4]The Refuge consists of two non-adjacent parcels – the 4,200-acre Highway 50 Unit and the 2,000-acre Beeline Unit.  (Doc. 329 at 11).  The Beeline Unit lies far to the south of the properties at issue here and has no relevance to this case.  Therefore, all references to "the Refuge" in this opinion should be understood to be references to the Highway 50 Unit only.

[5]The "hydroperiod" is the length of time water is present on the surface of a wetland.

bulldozing the spoil from off their banks down into the ditch. (Tr. 546).[6] These steps increased

the amount of time water remained on the Refuge before it drained off toward the St. Johns River.

In the late 1980s, the Florida Department of Transportation ("FDOT") set out to expand

State Road 50 from two lanes to four. Because the expansion resulted in loss of wetlands, FDOT

was required to engage in mitigation to offset it. After negotiations involving a number of state

and federal agencies, St. Johns issued a permit to FDOT for the mitigation project, which was

performed by Fish & Wildlife with FDOT funding. The work was completed in 1991. The

mitigation project involved two steps: completely filling the east-west canals west of Hacienda

Road and replacing six existing 30-inch diameter culverts under Hacienda Road with nine 36-inch

diameter culverts. The new culverts included "riser structures" – metal frames, attached to the

culvert, into which one or more boards could be inserted to partially or completely dam the flow of

water into the culvert. (Tr. 402-03). Refuge employees would insert one or more of the five-inch-

high riser boards to increase the water levels east of Hacienda Road. (Tr. 1797).

The Plaintiffs, Modern, Inc. ("Modern") and First Omni Service Corp ("First Omni"), are

Florida corporations with their principal places of business in Brevard County. Modern is

principally owned by Charles Moehle, who is also its president. His son, Michael, is president of

and owns First Omni. Modern owns a parcel,[7] purchased in 1991 (Tr. 52) and tucked into what

_____

[6]There is no evidence that Fish & Wildlife ever intentionally plugged or filled canals east of Hacienda Road. However, there was testimony that travel and other Fish & Wildlife activities on that portion of the Refuge, such as creating firebreaks, would sometimes result in part of the adjacent berm being inadvertently knocked into the canal.

[7]The record is not clear as to the precise size of the properties owned by either Modern or First Omni. The Plaintiffs contend that they currently "possess deeds evidencing ownership of 132.5 acres" located in the northwest and northeast quadrants of the intersection of Interstate 95 and State Road 50.

would otherwise be the southeast corner of the Refuge, adjacent to Interstate 95 and State Road 50. Modern's property is located south of the intersection of NS1 and EW1, with NS1 running along the western edge of the property and through the property itself for part of its length. First Omni owns a parcel on the east side of the Interstate and slightly north, which it purchased in 1996. (Doc. 329 at 10).[8] Dr. William Dennis, the Plaintiffs' ecology and wetlands expert, testified that, in its natural state – i.e., without benefit of the Drainage System – a large majority of the Plaintiffs' property would be jurisdictional wetlands. (Tr. 1079).

In January 1996, Charles Moehle wrote a letter to St. Johns, complaining of flooding of the Plaintiffs' property. (Tr. 81). A series of negotiations ensued, involving the Plaintiffs, Fish & Wildlife, FDOT, St. Johns and Brevard County, among others. To try to alleviate the flooding, the County agreed to conduct some custodial dredging of the IRCC and to install a culvert in a road that had been constructed across the IRCC, blocking its flow. The County also agreed to perform some dredging on NS1 south of State Road 50. Sometime in 1997, Fish & Wildlife removed the riser boards that had been added to the culverts under Hacienda Road.[9]

_____

(Doc. 449 at 42). However, the Plaintiffs do not specify how much of this 132.5 acres is the Modern parcel, how much is the First Omni parcel, and how much, if any, is other property not involved in this matter. Although it does not affect the outcome, based on a review of the exhibits in this case the Court estimates that the Modern parcel that is the focus of this dispute comprises about 65 acres.

[8]In the words of the Plaintiffs, "First Omni's property consists of a man-made pond created as a borrow pit." (Doc. 449 at 11). "Flooded" is the typical condition for a borrow pit, and First Omni did not produce any evidence that any of the Defendants were responsible for its flooded condition or that drainage easements are required for it to be utilized. Therefore, the remainder of this opinion will focus on the Modern parcel only.

[9]Refuge manager Ron Hight testified that, shortly before the trial, members of his staff noticed that two riser boards in one Hacienda Road culvert had apparently been missed when the others were removed in 1997. (Tr. 1795). Those boards were immediately removed. (Tr. 1795). There is no

In January 1997, Modern performed what it termed "maintenance" dredging of portions of EW1 and NS1 on and near its property.  (Occlusion and vegetation growth had obstructed significant portions of these ditches, greatly reducing their capacity to drain Modern's property.)  Essentially, EW1 was made wider and deeper from the intersection with NS1 a short distance to the east, and the same was done to NS1 from a short distance north of EW1 all the way south to State Road 50.  Modern did not obtain a permit from St. Johns for the dredging.

By all accounts, the dredging was extremely effective, and NS1 began moving a tremendous volume of water off of Modern's property to the south.  (Tr. 110).  The dredging contractor, standing on the headwall of the culvert at NS1 and State Road 50, watched a 3- to 4-foot wall of water flow down NS1 and hit the headwall before passing through the culvert toward the Addison Canal.  (Doc. 50, Exh. I at 35).  The dredging eventually lowered water levels across hundreds of acres of open water and wetlands, primarily on the Refuge.  Fish & Wildlife feared the lower water levels would harm species on the Refuge, and complained to St. Johns.  On May 14, 1997, St. Johns entered an order (the "Emergency Order") allowing Fish & Wildlife to install earthen weirs in the affected canals to undo the effects of the dredging.  (Plaintiff's A-117).  The weirs were to be installed at heights that would restore the canals to the depths as they existed just before Modern's dredging – an elevation of 12.7 feet in NS1 and 11.7 feet in EW1.  (Plaintiff's Exh. A-117 at 6).  Some time thereafter, pursuant to the Emergency Order, Fish & Wildlife installed weirs at these heights in NS1 just north of EW1 and in EW1 just east of NS1, both on Refuge property.

_____

evidence that Fish & Wildlife has employed riser boards since then or has any intent to do so.

-7-

On August 27, 1997, St. Johns filed an Administrative Complaint and Proposed Order (the "Administrative Complaint"), alleging that Modern improperly excavated portions of the two canals and proposing two ways in which Modern could effectively restore them to their pre-excavation depths. (Pl. Exh. A-119). Modern and First Omni challenged both the Emergency Order and the Administrative Complaint. After a lengthy hearing, an administrative law judge found that the dredging exceeded the scope of routine custodial maintenance and therefore required a permit. (Pl. Exh. A-283). On June 15, 1999, the ALJ recommended that St. Johns uphold the Emergency Order and direct Modern to undertake one of the two potential corrective actions outlined in the Administrative Complaint. (Pl. Exh. A-283 at 187). One of those potential corrective actions required Modern to fill in the northernmost excavated section of NS1 to an elevation of 12.7 feet, based on survey data taken in early 1996 and early 1997. (Pl. Exh. A-119 at 15). This potential corrective action also required Modern to bulldoze the freshly excavated materials along the remainder of NS1 back into the canal. (Pl. Exh. A-119 at 15).

Modern complained to St. Johns that, among other things, the weirs and the potential corrective actions in the Administrative Complaint were excessive in height and scope. (Doc. 50, Exh. J at 75). In December 1999, St. Johns rejected this argument and entered an order (the "Final Order") adopting those parts of the ALJ's recommendations that are relevant to this case. (Pl. Exh. A-134). St. Johns ordered Modern to undertake one of the two sets of corrective actions set forth in the Administrative Complaint. ((Pl. Exh. A-134 at 106). Modern appealed the Final Order, but the First District Court of Appeals affirmed it in all relevant respects. *St. Johns River Water Management Dist. v. Modern, Inc.*, 784 So. 2d 464 (Fla. 1st DCA 2001). By July 2003,

Modern had substantially complied with the requirement to fill in the northernmost excavated section of NS1 and bulldoze the newly excavated material back into the canal. (Doc. 449 at 29).

With the administrative process complete, Modern and First Omni proceeded with inverse condemnation claims in state court against St. Johns and FDOT.[10]   In October 2002, the Plaintiffs filed their Second Amended Complaint, adding Fish & Wildlife as a defendant.  Subsequently, the Defendants timely removed the case to this Court.  Now operating under their Fourth Amended Complaint (Doc. 71),the Plaintiffs proceeded to trial on the following claims: inverse condemnation by way of flooding against St. Johns and FDOT (Counts I and II); declaratory relief against St. Johns and FDOT to establish the existence and location of drainage easements (Count III); an action under 28 U.S.C. § 2409a to quiet title against the United States as to various drainage easements across the Refuge (Count IV); and injunctive relief against FDOT and St. Johns for trespass (Count V).  The Plaintiffs reserved their right to pursue their inverse condemnation claims against the United States.  (Doc. 70 at 9).

The case was tried, without a jury, over four days in August 2006, eight days in April 2007, and two days in May 2007.  The parties submitted their post-trial memoranda on July 30, 2007.

## III.    Analysis

Although this case has consumed more than 10 years of litigation, hundreds of hours of courtroom time and tens of thousands of pages of documents – as well as, the Court assumes, substantial attorneys' fees – in the end it boils down to two questions: What drainage easements, if

---

[10]The Plaintiffs had filed a state court suit in 1997 but ran afoul of the rule requiring exhaustion of administrative remedies.  The state court dismissed the original complaint and held the suit in abeyance until the administrative proceedings ran their course.  (Doc. 71 at 8).

any, does Modern possess?  And did FDOT or St. Johns interfere with Modern's drainage rights and cause Modern's property to flood?[11]

### A.     Easements

An easement is a right in the owner of one parcel of land (known as the "dominant estate"), by reason of such ownership, to the unfettered use of the property of another (known as the "servient estate") for a special purpose not inconsistent with the general property rights of the owner.  *See*, *e.g.*, *Easton v. Appler*, 548 So. 2d 691, 694 (Fla. 3d DCA 1989).  Easements may be created by express grant, by implication, or by prescription.  *American Quick Sign, Inc. v. Reinhardt*, 899 So. 2d 461, 465 (Fla. 5th DCA 2005).  Once created, an easement is transferred with the dominant estate even if not mentioned in the instrument of transfer.  *Behm v. Saeli*, 560 So. 2d 431, 432 (Fla. 5th DCA 1990).

The Plaintiffs contend that they possess express, implied, and common law drainage easements through the Refuge.  (Doc. 71 at 14).  Prior to trial, the Court granted summary judgment to the United States on Plaintiffs' common law flowage easement claim (Doc. 392 at 11-12) and Plaintiffs' claims that language in certain deeds dated 1915, 1917, and 1957 created an easement (Doc. 392 at 12).  The Court also rejected Plaintiffs' efforts to add a prescriptive easement claim.  (Doc. 382 at 1).  At trial the Court rejected the Plaintiffs' argument that Spanish Civil law established their drainage rights.  The Plaintiffs' remaining easement claims are addressed below.

---

[11]As noted above, the Plaintiffs are not pursuing an inverse condemnation claim against the United States in this action.

1.    Express easements

An express easement may be created by way of a grant contained in a deed or other written

document.  *Id.* at 464-65.  An express easement may also be granted by way of dedication and

acceptance, which entails an intentional appropriation of land by the owner for use by others.

*Owen v. Yount*, 198 So. 2d 360 (Fla. 2d DCA 1967) (filing of plat with 25-foot wide lakefront lot

marked "drainage easement" and that lot's subsequent use by non-lakefront landowners to access

lake created public drainage easement with secondary use of lake access).

The Plaintiffs' express easement claim rests on the plat for the Titusville Fruit Tract.   (Pl.

Exh. A-3).  The platted area encompasses the Plaintiffs' property, the land upon which the

Drainage System was constructed, and most of the property that comprises the Refuge.  No

reference to "drainage" or "canals" or the like appears on the plat.  However, in addition to single

lines that divide the platted area into five-acre lots, a grid of double lines criss-crosses the plat.  A

wide set of double lines runs along the border of each of the plat's one-square-mile Sections.  In

addition, each Section is split in half from north to south by a thinner set of double lines and split

into fourths from east to west by three sets of these thinner double lines.  According to the legend

that appears on the plat, the wider set of double lines indicates "50 Ft. Road", while the thinner set

of double lines indicates "20 Ft. Road."

Generally speaking, the evidence at trial showed that the Drainage System was laid out in

the locations shown on the plat by these double lines.  More specifically, although the Drainage

System never occupied all of the areas shown as roads on the plat, it was constructed, with minor

exceptions, in those areas.  Based on this, the Plaintiffs argue (in several different ways) that the

"road" language on the plat resulted in the creation of an easement in the Drainage System for the benefit of their predecessors in title and themselves.

As a general principle, an easement carries with it the right to do what is reasonably necessary for the full enjoyment of the easement itself. *Florida Power Corp. v. Silver Lake Homeowners Ass'n*, 727 So. 2d 1149, 1150 (Fla. 5th DCA 1999) (citing, *inter alia*, 20 Fla.Jur.2d Easements § 29 (1980)).  As shown at trial by the testimony of Plaintiffs' drainage expert, Robert Sprinkle, excavation of a drainage ditch is often the first step in the construction of a road across a marshy area, and such roads would likely become impassable in the absence of drainage.  The ditch spoil provides the material to raise the road above the surrounding marsh, and the ditch drains the surface water and lowers the water table, stabilizing the soil.  Based on this, the Court assumes that any road easement created by the Titusville Farms plat carried with it the right to build and maintain such ditches as were necessary to drain the road.

However, contrary to the Plaintiffs' argument, this does not establish that the plat created an easement that would entitle the Plaintiffs to utilize the Drainage System.[12]  What the Plaintiffs are arguing for is an easement that allows not just drainage of a road, but a drainage easement independent from an adjacent roadway.  And they are seeking to impose that easement on property

---

[12]The Plaintiffs have consistently argued that they are entitled to an easement extending over the entire Drainage System, rather than merely some fraction of it. *See, e.g.*, Doc. 449 at 46.  The Court notes that the state of Florida follows the "beneficial" or "complete enjoyment" rule with regard to implied easements: "This rule is 'that the extent of the grantee's private right of user in streets and alleys shown on a map or plat by reference to which his conveyance was made is *limited to such streets and alleys as are reasonably and materially beneficial to the grantee and of which the deprivation would reduce the value of his lot.*'" *Powers v. Scobie*, 60 So. 2d 738, 740 (Fla. 1952) (emphasis added).

that, although described as "50 Ft. Road" or "20 Ft. Road" on the plat, never had a road built upon it.[13]  The right to do what is needed to enjoy an easement must not be increased to any greater extent than reasonably necessary and contemplated at the time the easement was created.  *Silver Lake Homeowners Ass'n* at 1150.

Although a road easement may include an associated right to some drainage, there is no evidence that the people who drew up the Titusville Fruit plat intended, at that time, to stretch the concept to such an enormous degree.  The Court concludes that the Plaintiffs have failed to show that the term "road" on the plat was intended to mean anything more than a road or to create an easement in the Drainage System.  This conclusion also disposes of the Plaintiffs' argument that the plat constituted an offer to dedicate the Drainage System to the public or to purchasers of lots within the Titusville Fruit Tract.  If anything was so dedicated, it was a road, not a drainage system.

2.    Implied easements

Primarily as a consequence of the statute of frauds,[14] which requires that transfers of property interests be evidenced by a writing, there are only two situations under Florida law in which an easement can be granted or conveyed by implication.  *Moorings Association, Inc. v. Tortoise Island Communities, Inc.*, 460 So. 2d 961 (Fla. 5th DCA 1984) (Cowart, J., dissenting).[15]

---

[13]Moreover, the evidence showed that a number of the ditches that were built on areas platted for 20-foot roads were themselves about 20 feet wide, precluding the construction of a road there.

[14]Fla. Stat. § 725.01.

[15]On appeal, the Florida Supreme Court reversed the decision of the Fifth DCA, agreeing with Judge Cowart's "well reasoned dissent" and adopting his reasoning "as our own".  *Tortoise Island Communities, Inc. v. Moorings Association, Inc.*, 489 So. 2d 22, 22 (Fla. 1986).

The first involves inferring the grant from a construction of the terms and effects of an existing deed – such as when a deed describes a lot by reference to a plat that shows servient lands held for the use and benefit of the subdivided lots, or where there is ambiguity as to the extent of an easement validly created by a written document.  *Id.* at 971.  In these situations, the deed or written document satisfies the statute of frauds, and the easement is merely created by implication from the writing and intention of the parties.  *Id.*  Such is not the case here.  As discussed *supra*, the Titusville Fruit plat did not create any standalone drainage easements, and there is no other written document that even arguably created easements but was ambiguous as to their scope.

The second situation involves what is referred to as an action to establish an easement for a way of necessity.  *Tortoise Island* at 971.  In this scenario, as described by Judge Cowart, the seller agrees to sell part of a larger tract, but the only access to the buyer's new property is a public road across the property retained by the seller.  *Id.* at 971. Even though the parties had not considered the access issue, the common law assumed that the seller was acting in good faith and intended to convey the beneficial use of that property to the buyer and therefore "raised up or implied as a matter of law a promise on the part of the seller to give a right-of-way of necessity to the buyer over and across" the property retained by the seller.  *Id* 721.

The creation of an implied easement for a way of necessity requires 1)  unity of title between the dominant and servient estate; 2) a conveyance; and 3) circumstances existing at the time of the conveyance which would make the easement necessary for the complete enjoyment of the estate granted or reserved.  *Kirma v. Norton*, 102 So. 2d 653, 656-57 (Fla. 2d DCA 1958).[16]  It

---

[16]The Defendants argue that *Tortoise Island* impliedly overruled *Kirma*.  After reviewing both cases, the Court concludes that in adopting Judge Cowart's dissent, the Florida Supreme Court

has been held that a use, to be considered an implied easement, must have been continuous, apparent, permanent, and necessary when the unified title was severed. *Id.* at 567.

It is not clear that a drainage easement (as opposed to an access easement) can ever constitute a way of necessity that could be created by implication.  For one thing, poor drainage is unlikely to be a complete bar to use of the land in the way that a lack of access would be.  Owners of property with poor drainage have other options – such as filling in low spots or digging retention ponds – not available to owners of landlocked property.  Even without such steps, poorly drained property likely has some potential beneficial uses, such as hunting or camping.  And Florida law already provides property owners with a common law drainage easement for the surface waters that fall on their properties, further weakening the argument that an additional drainage easement is essential. *Gus Machado Buick, Inc. v. Westland Skating Center, Inc.*, 523 So. 2d 59, 597 (stating that the owner of higher elevation land has an easement on lower elevation land for the natural flow of surface water).  Easements created by necessity have the implied purpose to make possible the use of the dominant land, and therefore will terminate when the necessity for their existence disappears.  *Parham v. Reddick*, 537 So. 2d 132, 135 (Fla. 1st DCA 1988).

Nevertheless, assuming *arguendo* that a drainage easement can be created as a way of necessity, the Plaintiffs' argument on this score fails for several reasons.  The Plaintiffs rely upon two effectively simultaneous 1957 conveyances by Sun Charm Ranch, Inc. ("Sun Charm") as the "transaction" that created their implied easements in the Drainage System.[17] (Doc. 449 at 50).  Sun

overruled the appellate court's interpretation of *Kirma* rather than *Kirma* itself.

[17]In their closing arguments, the Plaintiffs for the first time suggested that they could rely upon conveyances of portions of the Titusville Fruit Tract to various third parties between 1913 to 1921 to

Charm owned approximately 40 percent of the original Titusville Fruit Tract, and its holdings encompassed a large portion of the property that now makes up the Refuge. However, Sun Charm never owned all of the property that makes up the Refuge. As shown in a chart prepared by Mr. Sprinkle (Pl. Exh. A-257), Sun Charm owned only a small fraction – less than 10 percent – of the Refuge property west of Hacienda Road. The property that Sun Charm did own barely extended west of Hacienda Road (and, in some areas, did not even reach that far). Thus, the Sun Charm transaction could not have resulted in the creation of an implied easement in the overwhelming majority of the segment of the Drainage System located west of Hacienda Road. (As discussed below, this seriously undermines the Plaintiffs' claims that the plugging and filling of the canals west of Hacienda Road interfered with their drainage rights.)

Furthermore, Sun Charm's holdings contained numerous "gaps" – parcels owned by some other entity – at the time of the 1957 transaction. As shown on Mr. Sprinkle's chart, such gaps spanned the Satterfield Road Canal, EW1.5, and the IRCC at different locations east of Hacienda Road. Two diagonally opposite gaps spanned EW1, reducing Sun Charm's property to a single point at that location. Sun Charm owned almost no property south of State Road 50, and gaps

---

establish their implied easements. (Doc. 449 at 49). However, the Plaintiffs made no effort to track these transactions and demonstrate how any individual transaction created an implied drainage easement for the benefit of the parcels they would eventually purchase. The Court cannot just assume that every transaction creates an easement. Moreover, the Plaintiffs failed to show that the entire Drainage System was in existence and operating before these transactions occurred – or, at least, that any canal in which they now claim an easement was in place prior to these transactions. The earliest photo showing the Drainage System at least arguably in a complete state was taken in 1943. (Tr. 701). Relying on newspaper articles, Mr. Sprinkle opined that Titusville Fruit continued to dig and expand ditches on the Titusville Farms Tract at least through 1917 – several years after the earliest of these third party transactions. (Tr. 695-700). The Court finds that the Plaintiffs have failed to show that any of the transactions from 1913 to 1921 resulted in the creation of an implied easement.

spanned portions of several of the north-south canals north of that highway.  Thus Sun Charm

lacked the unity of title needed for the Plaintiffs to claim entitlement to an implied easement in the

Drainage System.

The evidence also demonstrated that the Plaintiffs do not possess the level of necessity

required to claim entitlement to an implied easement under *Kirma*.  Charles Moehle described the

Drainage System as having "redundant" drainage capacity – i.e., more than just what is necessary

to drain the Plaintiff's property.  Plaintiffs' drainage expert, Robert Sprinkle, also testified that the

Drainage System, when fully clear, "has some redundancy in it."  (Tr. 1118 at 6-7).  Most

damaging is the fact that, as soon as the dredging was performed on NS1 and EW1, Modern's

property began draining to the south, under State Road 50.  If these portions of NS1 and EW1 are

enough, by themselves, to drain Modern's property, the Plaintiffs cannot claim that they require

easements in the entire Drainage System or even easements running west across the Refuge.

Finally, the Plaintiffs failed to show that the Drainage System had been in continuous use

at the time they purchased their properties.  The canals west of Hacienda Road had been plugged

(though not filled in entirely) long before Modern bought its parcel (Tr. 546).  Many of the other

canals had become silted or overgrown with vegetation, and some had been blocked by subsequent

construction.  Aerial photographs of Modern's parcel taken in 1943, 1951 and 1958 show NS1 and

EW1 clear and draining well.  (Def. Exh. 596-598).  However, a photo taken in 1969 shows EW1

blocked just east of the intersection with NS1.  (Def. Exh. 599).  A photo taken in 1971 shows the

same blockage, plus another blockage in NS1 just north of the intersection, and shows that a

portion of NS1 just south of the intersection has become silted in.  (Def. Exh. 479).  Subsequent

photos from 1980, 1986, 1989, 1994, and 1995 show the same thing, although the silted-in portion of NS1 appears longer. (Def. Exh. 600-604).

The Plaintiffs have failed to show that the Sun Charm transactions (or any other transactions) led to the creation of an implied easement for a way of necessity.

### B.    Flooding

Under Florida law, state action that causes flooding on abutting private property may constitute a taking where the flooding is a permanent invasion of land amounting to an appropriation. *See, e.g., Kendry v. State Road Department*, 213 So. 2d 23, 26 (Fla. 4th DCA 1968). Plaintiff's claim for inverse condemnation against St. Johns and FDOT is predicated primarily on the expert report and testimony of Mr. Sprinkle, a Florida professional engineer who specializes in drainage issues. In formulating his opinion, Mr. Sprinkle used a standard modeling technique (the ICPR, or Interconnected Channel and Pond Routing Model) to measure the hydrological effect of certain activities over a period of time – a before-and-after look at the wetness of Plaintiff's property. As the starting (before) date, he used 1970, which was just prior to the creation of the refuge and restoration activities that occurred thereafter.[18] As his end (after) date, he used 2003, when the Plaintiff claims its flooding claim matured.

In simplest terms, the ICPR model depicts the basins in which water collects and the links, such as canals or culverts, by which the water moves or which can impede its movement. For each

---

[18] The Plaintiffs contend that the property was dry in the 1970s, and in support point to a field survey of dusky habitat performed by Dr. Baker in 1973. (Pl. Exh. A-17). However, Defendant's expert, William Dunn, observes that the survey was conducted during drought conditions. (Tr. 2020). Moreover, Dr. Baker was concerned with the ground cover affecting duskies and not the hydrological conditions. In any event, it is probably true that the property was drier in 1970 than it is today.

basin and link in the model, values are input for factors that affect runoff, such as topography, soil type, ground cover and, of course, the amount of rainfall. (Tr. 416). The model can then generate a runoff hydrograph, depicting the water levels that would result and the duration of any flooding after a particular amount of rain over the area. (Tr. 775).

To create his 2003 model, Mr. Sprinkle made changes in his 1970 model that reflected the following events:

(1)   the filling of the ditches west of Hacienda Road as part of the FDOT mitigation project;

(2)   the installation of culverts under Hacienda Road as part of that project;

(3)   the installation by Brevard County of culverts under Hacienda Road after the Plaintiffs complained of flooding in 1996;

(4)   blockages in EW1 and EW1.5 in the Refuge east of Hacienda Road occurring as a result of lack of maintenance;

(5)   a blockage of NS2 south of State Road 50 near the Great Outdoors RV park, resulting from construction there;

(6)   a blockage across NS1 south of State Road 50 near a wastewater treatment plant, also resulting from construction there;

(7)   Fish & Wildlife's installation of a weir in NS1 just north of its intersection with EW1 as a result of the Final Order;

(8)   Fish & Wildlife's installation of a weir in EW1 just east of its intersection with NS1 as a result of the Final Order; and

(9)     the filling-in of 500 feet of NS1 south of EW1 as a result of the administrative

proceedings.

(Tr. 789; Pl. Exh. A-259).[19]

After running both models, Mr. Sprinkle concluded that in 1970, the ditch system was

adequate to effectively drain Plaintiff's property, but in 2003, the system could no longer do so.

(Tr. 800-03).  Indeed, Sprinkle's model reflected a significant increase in the flooding of Plaintiff's

property in 2003, compared with 1970.  (Tr. 805; Pl. Exh. A-216).  Moreover, Mr. Sprinkle

performed a field validation of his model results after Hurricane Wilma passed through the area in

October of 2005.  According to Mr. Sprinkle, the elevation measurements taken after this storm

event[20] closely coincided with the prediction of his 2003 model results.  (Tr. 811).  In sum, Mr.

Sprinkle opined that the water table on Plaintiff's property has increased significantly (two to three

feet) since 1970, leading to significantly more flooding.

The Defendants criticize Sprinkle's modeling in various ways.  For example, Defendants

called as their own expert Ms. Cynthia Skogsberg, a licensed professional engineer who also

_____

[19]At trial, the parties also spent a significant amount of time discussing two effects of the State
Road 50 widening: the removal of a drainage ditch that had run along the south side of the highway;
and the installation of an allegedly ineffective "underdrain" system in the median.  In their closing
arguments, the Plaintiffs argue that these activities also impeded the Drainage System and contributed
to the flooding.  (Doc. 449 at 16-18). However, Sprinkle testified that these items were not included
in his models, and therefore they could not have contributed to the increased water levels in his 2003
model.  (Tr. 1025-27).  The Court finds that the evidence is insufficient to consider them as possible
contributors to the flooding.

[20]*See* Pl. Exh. A-293.

specializes in drainage modeling.  Ms. Skogsberg did not prepare her own model; rather, she

offered a critique of Mr. Sprinkle's model.[21]  Specifically, Ms. Skogsberg opined that:

(a)     because 1970 was a dry year and 2003 was a wet year, Mr. Sprinkle's comparisons

between the two years is not scientifically valid (Tr. 2072);

(b)     Mr. Sprinkle's model misplaced the culverts under Interstate 95 at Satterfield Road

(Tr. 2079);

(c)     it was inappropriate to model the IRCC and northside SR 50 ditch as a double ditch

(Tr. 2082);

(d)     Mr. Sprinkle used improper ditch cross-sections (Tr. 2101);

(e)     Mr. Sprinkle's 1970 model curve numbers were wrong (Tr. 2136);

(f)     the starting surface water elevation used by Mr. Sprinkle for the 1970 model was

too low (Tr. 2147); and

(g)     Mr. Sprinkle's basin delineations fail to account for surface water runoff (Tr. 2175).

According to Ms. Skogsberg, these errors render Mr. Sprinkle's results invalid and serve to

exaggerate the flooding effects of the factors modeled by Sprinkle.[22]  Ms. Skogsberg dismisses the

results of Mr. Sprinkle's Hurricane Wilma field validation as mere coincidence.  (Tr. 2177).

---

[21]According to Ms. Skogsberg, she would require a complete survey of the entire ditch system in order to run an accurate drainage model.  (Tr. 2217).  Mr. Sprinkle contends that such a survey would be prohibitively expensive.

[22]Defendants also contend that Sprinkle's model is invalid because it uses a start date of 1970, which is almost 20 years prior to any relevant conduct by the State defendants.  For the reasons expressed *infra*, the Court agrees with this criticism.  The relevant conduct of these Defendants occurred in the late 1980s-early 1990s.  During the interim (1970-1990), the ditches were not being maintained and significant erosion/degradation likely occurred which would adversely affect their drainage capability.

Defendants also called Dr. Devo Seereeram, an expert in hydrology, who criticized Mr. Sprinkle's conclusion that the Drainage System as it functioned in 1970 would serve to lower ground water elevations across the property by several feet.  Using a conservative ditch cross-section, Dr. Seereeram concluded that the three-foot water table draw-down predicted by Mr. Sprinkle would occur only immediately next to the ditches, and that a two-foot draw-down would extend less than 70 feet from the edge of the ditch.  (Def. X-B728).  Thus, according to Dr. Seereeram, in order to lower the water table on Modern's property by two to three feet, the drainage ditches would have to be spaced no more than about 150 feet apart.  (Tr. 1665-66).

However, even assuming Mr. Sprinkle's hypothesis to be true (*i.e.*, that the water table on Modern's property has risen significantly since 1970, resulting in more frequent and longer post-rainfall flooding), the critical question becomes, what caused this increase?  More specifically, the

question is whether this increase is attributable to any conduct of the state defendants?[23]   To

answer this, we must examine the nine changes modeled by Mr. Sprinkle.

First, it must be noted that Mr. Sprinkle made no effort to apportion the effect of these nine

factors, saying it was "almost impossible to isolate an impact". (Tr. 851).   However, he admitted

that some of the factors have more impact than others. (Tr. 1118).   In particular, he opined that the

items closest to the Modern property would have the greatest impact on its water level.   He

estimated that the weir in NS1 and the 500 feet of fill-in of NS1 probably had the greatest impact,

with the weir in EW1 being behind those two.   Behind those three items would be the blockages in

EW1 and EW1.5 east of Hacienda Road, followed by the culverts under Hacienda Road if the riser

boards were to be installed.   The remaining items – the filling of the ditches west[24] of Hacienda

_____

[23] The Plaintiffs attempt to avoid this issue by arguing that FDOT and St. Johns can be held jointly and severally liable for the flooding shown by Mr. Sprinkle's model.  Modern points out that under Florida law, where the conduct of two or more governmental entities combines to cause harm to a property owner, the entities can be held jointly liable for the harm.  *See*, *e.g.*, *Anhoco Corp. v. Dade County*, 144 So. 2d 793 (Fla. 1962) (in condemnation suit, county held responsible for State Road Department's restriction of access to subject property, even though road department was not party to suit, where restriction occurred as part of joint project involving county and road department).  *Accord*, *Lost Tree Village Corp. v. City of Vero Beach*, 838 So. 2d 561 (Fla. 4th DCA 2002) ("Multi-government action, of which the combined effect deprives a landowner, constitutes a taking.").

But even if one accepts Mr. Sprinkle's model as true, this principle is not applicable here.  Mr. Sprinkle did not model the results of a joint undertaking, as was the case in *Anhoco Corp.*, or a situation in which the combined effects of two defendants' (otherwise non-harmful) activities constituted a taking, as in *Lost Tree Village*.  Mr. Sprinkle showed that if nine things change, flooding results.  He did not show that all nine changes were needed to cause that flooding, and as discussed *infra*, these defendants were not responsible for all nine changes.  Joint and several liability is not appropriate under such a scenario. The Plaintiffs cannot avoid their obligation to establish each defendant's liability by including them in a group with someone else who may be liable.

[24] In this portion of his testimony, Sprinkle actually referred to ditches "east" of Hacienda Road, but given the context, he must have meant to refer to the ditches west of that road.

Road, the blockages of NS2 and NS1 south of State Road 50 – would rank behind the other items. (Tr. 1171-72).

More importantly, most of the changes modeled by Mr. Sprinkle cannot be attributed to St. Johns or FDOT.  The weirs and the filling-in of 500 feet of NS1 (factors 7-9) merely reestablished the status quo as it existed before Modern's unpermitted dredging and cannot themselves constitute a legal cause of any subsequent flooding.  No evidence at trial linked FDOT or St. Johns to the blockages in EW1 and EW1.5 east of Hacienda Road or the blockages in NS1 and NS2 south of State Road 50 (factors 4-6).  Moreover, the evidence was uncontradicted that the installation of culverts under Hacienda Road (factors 2-3) improved drainage, not hampered it.

The Plaintiffs, however, raise a different argument in regard to this final point.  The new culverts under Hacienda Road included riser structures, which allowed Fish & Wildlife to add riser boards and completely block the flow of water.  The Plaintiffs contend that, because no Defendant agreed to be bound not to ever employ these riser boards, this Court is "compelled" to assume that those riser boards will be employed in the future.  (Doc. 449 at 19 n.6).  In support, the Plaintiffs point to *Department of Transportation v. St. Regis Paper Co.*, 402 So. 2d 1207 (Fla. 1st DCA 1981).

In the *St. Regis Paper* case, FDOT was condemning a portion of a lot for a highway, and the condemnation eliminated the road that had been used to access the lot.  *Id.* at 1208.  FDOT's construction plans for the highway showed that there would be no access to the remainder of the lot.  *Id.*  The trial court refused to allow FDOT to introduce two of its standard documents as evidence that it would, nonetheless, construct a turnout to allow access to the remainder of the lot. *Id.*  The trial court also refused to allow an engineer to testify to this effect.  *Id.*  Instead, the trial

judge directed a verdict for the landowners based on the assumption that the worst possible

damage – *i.e.*, total deprivation of access – would occur to the remaining property.  *Id.*  On appeal,

the First District Court of Appeal affirmed the decision, finding 1) that there was nothing in the

plans or the standard documents that showed any access to the landowners' property and 2) that

the engineer did not have the authority to make commitments on behalf of FDOT  *Id.*  As such, the

trial court had not erred in refusing to admit the disputed evidence or in directing a verdict for the

landowners.  *Id.*

In the words of the Florida Supreme Court, the *St. Regis Paper* line of cases stands for the

proposition that a condemnor may not present evidence of its nonobligatory, permissive policy of

allowing the condemnee to continue certain uses of the taken property.  *Trailer Ranch, Inc. v. City

of Pompano Beach*, 500 So. 2d 503, 506 (Fla. 1986).  "Allowing this type of permissive policy to

be presented to the jury for determining the extent of damages is misleading because it suggests

that the condemnee retains a greater property interest that he actually does, as the policy may

change at the condemnor's will at any time in the future."  *Id.*

This principle of law has no application in an inverse condemnation context, where the

court must determine whether the defendants' policies have resulted in a taking rather than the

damages caused by that taking.  Stated differently, the Plaintiffs cannot use *St. Regis Paper* to

bootstrap a potential future taking into an actual taking.

Thus, the only potential flooding cause from Mr. Sprinkle's model that can be attributed to

FDOT or St. Johns is the filling of ditches west of Hacienda Road as part of the mitigation project

(factor 1). As a result, the only relevant issue is whether and to what extent the filling of these ditches affected the upstream impoundment of water on Plaintiff's property.[25]

In this regard, two things are apparent: (1) the biggest contributing factor to Plaintiff's flooding is the blockage of the ditches at or near the intersection of NS1 and EW1;[26] and (2) the filling of ditches west of Hacienda Road had little, if any, impact on Plaintiff's property.

With respect to the latter, when Charles Moehle complained in 1996 about the flooding of Modern's property, Ralph Brown, a supervising engineer with St. Johns, was asked to investigate. Specifically, he tried to ascertain whether the FDOT mitigation project west of Hacienda Road had any impact on the upland property. (Tr. 1826). As part of his investigation, he surveyed and photographed the ditches east of Hacienda Road, with particular emphasis on EW1 and NS1. He found that EW1 west of NS1 was shallow (elevation of 12.6 feet) and totally overgrown with vegetation. (Tr. 1828).[27] Likewise, NS1 just south of its intersection with EW1 was shallow and overgrown with vegetation. Since the elevation of EW1 at Hacienda Road was 11 feet, he concluded that the control elevation of EW1 was east of Hacienda Road. (Tr. 1860, Def. Exh. A-688-1). Thus, because the FDOT mitigation project *increased* the culvert capacity under Hacienda

---

[25]At the outset of this discussion, it is important to note that during the 1970s, as part of its dusky recovery plan, Fish & Wildlife had plugged these ditches at regular intervals. Thus, when the FDOT mitigation plan was implemented in the late 1980s, the ditches west of Hacienda Road were no longer providing unobstructed drainage.

[26]Mr. Sprinkle admits as much. (Tr. 2488). Moreover, the excavation of EW1 and NS1 were enough to effectively drain Modern's property. (Tr. 110, 824).

[27]Other blockages east of Hacienda Road were also noted.

Road and because elevations decrease west of Hacienda Road, he concluded that the mitigation work could not be the cause of any flooding on Modern's property.  (Tr. 1866).

As its drainage expert, FDOT called Mark Llewellyn, a registered professional engineer who specializes in storm water management.  Mr. Llewellyn summarized the human activities which, over time, have affected this 3,500 acre drainage basin.  He then discussed the State Road 50 mitigation project, including the filling of ditches west of Hacienda Road and the installation of eleven 36-inch culverts under Hacienda Road (nine by Fish & Wildlife and two by Brevard County) to replace the six or seven 30-inch culverts that had previously run under Hacienda Road.  (Tr. 2303).

Mr. Llewellyn's hypothesis was that Hacienda Road and the un-ditched marsh to the west (post-mitigation) would have no impact on water staging to the east of Hacienda Road.  To test this hypothesis, he assumed a worse-case scenario with all water in the basin flowing toward Hacienda Road.  (Def. Exh. B-584, Tr. 2317).  With this underlying premise, he modeled several different storm events with two different tailwater conditions.  The results of this modeling experiment revealed no impact on the east side of Hacienda Road.  During rainfall events, the water would sheet-flow over the saturated marsh even without the benefit of the shallow ditches that existed pre-mitigation.  (Tr. 2319).  Because of this, and because of the ample flowage capacity provided by the larger and more numerous culverts installed under Hacienda Road,[28] he

_____

[28]Of course, this assumes that riser boards have not been installed in the culverts.  However, Mr. Sprinkle modeled these culverts as being open – *i.e.*, without riser boards installed – in his 2003 model.  (Tr. 853).

concluded that the mitigation project would have no adverse impact on Plaintiff's property.  (Tr. 2318).  (Tr. 2319).

Finally, Ms. Skogsberg ran various scenarios of Mr. Sprinkle's models by changing certain inputs to values that she deemed more reasonable.  (Tr. 2178).  Under scenario 8 (Def. Exh. 743), she used what she believed to be appropriate curve numbers and roughness coefficients to ascertain the effect of the Hacienda Road mitigation project.  Under this scenario, the upstream effect on Plaintiff's property using the Sprinkle model was less than one-third of an inch.  (Tr. 2184-85).

Based on this evidence, the Court concludes that Plaintiff has failed to meet its burden of proving that any relevant conduct by FDOT or St. Johns has contributed to the alleged flooding of Plaintiffs' property.  Indeed, the evidence is to the contrary.[29]  Moreover, the relevant conduct (filling of ditches west of Hacienda Road) merely restored the marsh to its natural condition. Thus, absent easement rights, even if this conduct caused water to impound, it is hard to see how it could form the basis for a flooding claim.  Certainly, the Plaintiffs never made a convincing argument or cited to any legal precedent for such an effect.

---

[29]If Modern's property is flooding due to poor drainage, it is caused primarily by the blockages at EW1 and NS1 near their intersection.  As noted *supra*, aerial photography clearly shows that occlusions existed at these locations in 1991 when Modern purchased the property.  The subsequent placement of the weirs and filling-in of NS1 merely restored the blockages that existed before the improper dredging.  The Plaintiffs presented no evidence to suggest that the weirs or the restored NS1 had elevations higher than those set forth by St. Johns in the Emergency Order or the administrative proceeding.

**IV.      Conclusion**

It is generally agreed that the Plaintiffs' property was originally part of the St. Johns River flood plain and, therefore, wetland.  In the early 1900s, the property was ditched and drained to make it suitable for farming and habitation.  However, the last evidence of ditch maintenance was in 1958, and the Drainage System thereafter began a natural process of erosion and degradation.  Dr. Dennis, the Plaintiffs' environmental expert, testified that the property was still essentially dry in 1970 but became increasingly wetter by 2003.  Therefore, it is likely that by 1990, 20 years, later, Modern's property was much wetter than it had been.  Aerial photography showing occlusions in the essential drainage features of the property (EW1 and NS1) bolsters this conclusion.

Charles Moehle contends that he did substantial on-site inspection and the property was dry when Modern purchased it in 1991.  Perhaps, but that contention is strongly rebutted by the evidence.  And, even if it were so, there is no evidence to suggest that any activities of St. Johns or FDOT could have caused the property to flood several years later.  In short, Modern's claim that

the conduct of those Defendants caused his property to flood after 1991 simply does not add up. Plaintiffs' property is wet because it was historically wet and because the 75-year-old system of drainage ditches is no longer viable.

In consideration of the foregoing, it is hereby

**ORDERED** that the Clerk enter judgment in favor of the Defendants and close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 28, 2007.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party